25 A.3d 1214 (2011)
422 N.J. Super. 52
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
I.S., Defendant-Appellant.
In the Matter of N.S. and S.S., Minors.
No. A-5793-09T3.
Superior Court of New Jersey, Appellate Division.
Submitted May 11, 2011.
Decided August 31, 2011.
*1217 Yvonne Smith Segars, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).
Paula T. Dow, Attorney General, attorney for respondent (Lewis A. Scheindlin, Assistant Attorney General, of counsel; Nancy Andre, Deputy Attorney General, on the brief).
Yvonne Smith Segars, Public Defender, Law Guardian, attorney for minor S.S. (Jeffrey R. Jablonski, Designated Counsel, on the brief).
Before Judges CUFF, SAPP-PETERSON and FASCIALE.
The opinion of the court was delivered by SAPP-PETERSON, J.A.D.
Defendant, I.S., appeals from two orders issued by the Family Part judge. The first order, issued January 18, 2008, found that neither I.S. nor E.S., the formerly-married biological parents of twin girls, N.S. and S.S. born in 1997, had the ability at that time to care for or meet the needs of their daughters. The order provided further that the "best interests" of the children necessitated their continued placement in the custody, care, and supervision of the Division of Youth and Family Services (Division). The order also included a provision directing the girls' continued placement in a residential facility. The second order, issued June 24, 2010, awarded custody of S.S. to E.S. as a result of the Family Part judge's conclusion that it would not be safe to return S.S. to I.S. and that it was in S.S.'s best interest to remain in the custody of E.S.
We affirm both orders. We hold that a Family Part judge, conducting an abuse or neglect fact-finding hearing, may, without a finding of abuse or neglect, enter an order continuing the Division's care, supervision, and custody of a child, based upon its determination that the court's continued assistance is required pursuant to Title 9, N.J.S.A. 9:6-8.21 to -8.73, or based upon a "best interests" analysis under Tile 30, N.J.S.A. 30:4C-11 to -14. We additionally hold that as long as appropriate procedural due process is satisfied and the requisite evidentiary standards and burdens of proof attendant to each statutory scheme are satisfied, hybrid proceedings, such as occurred here, will not be set aside.
Following their divorce, which was contentious, I.S. and E.S. continued to appear before the Family Part to resolve disputes primarily related to custody and parenting. The Division was familiar with the family through numerous referrals concerning the *1218 welfare of the twins. Upon investigation, the allegations were found to be unsubstantiated. Both girls were diagnosed with Pervasive Developmental Disorder (PDD), Obsessive Compulsive Disorder (OCD), Anxiety and possibly Bipolar Disorder. They were being treated with a number of medications, which led defendant to suspect that the girls had become over-medicated. Additionally, both girls were placed, albeit separately, in special education classes, and individualized education plans were developed for them. School officials frequently contacted defendant regarding the twins' behavioral problems. Defendant, on her own initiative, attempted to secure assistance to address their behavioral issues, primarily working with the Division of Developmental Disabilities (DDD). She was not, however, successful in admitting the girls to any program.
On September 7, 2007, the in-home therapist reported to the Division that I.S. told her that N.S. had pulled out a knife and was walking around the house wielding it. I.S. also told the therapist that she had become overwhelmed by the girls' destructive behavior toward each other and toward their grandparents.
Several days later, the Division received another referral that the girls were wandering about the neighborhood unsupervised. On September 16, the Division received a referral from staff at Virtua Hospital that I.S. was there with the girls seeking their placement. A Division worker responded to the hospital and interviewed defendant, who indicated that DDD advised her to take the girls to the emergency room if she could not manage them and the girls would then be placed.
As a result of the Division's investigation, it filed a complaint alleging abuse and neglect and seeking custody, care, and supervision of the children under Title 9 and Title 30. An Order to Show Cause (OTSC) hearing was conducted by the court on September 24. During the hearing, I.S., through her attorney, informed the court of her desire to have her daughters placed in a residential facility that could help them. She did not want them in a regular foster home, nor did she want the children separated. When the court advised that it could not make a finding of abuse or neglect because there had been no such allegations, the court inquired whether defendant was consenting to the Division's care, custody, and supervision of the children. The Division's attorney interjected that the complaint had also been brought under Title 30:
And part of Title 30[,] one of the things is where a parent is either unwilling and also unable to provide the necessary care, maintenance, health and education, supervision of a minor child. And, I think, that's what the allegation, essentiallyas I understand the caseworker's testimony, that due to the children's extensive destructive behavior and the fact that mom might be overwhelmed with their care that, at least, at some point at this time, she's unable to provide for their proper protection and maintenance. That's not Title 9, that's not neglect and abuse. But it does allow and give the [c]ourt the authority and jurisdiction to be able to place the children in the custody of the Division.
In response to the court's inquiry, defendant's attorney represented:
My client, simply, wants help for her children. To the extent that the State would come in and expedite those things that are necessary, she would have the [c]ourt order Title 30 in on her behalf. But, to the extent that they will continue even past or should it develop that [DDD] actually goes ahead and does what's necessary, we would ask that *1219 DYFS, by order, step away and allow herbecause she has all this time done everything, you know, in the way of petitioning and applying, and what have you, to have her children placed. She wishes to continue on her own, except that it's moving so slowly. And, in fact, there is an appeal because ... [the] A[ppellate] D[ivision] has[ ] actually declined.
So, hopefully, DYFS can step in; do what's necessary; and step away.
Later, defendant was given an opportunity to address the court and she explained in detail her frustration with the delay on the part of DDD in providing the needed services for her daughters. She told the court that she did not want her children taken away from her but instead wanted services for her children, the same kinds of services she, as a nurse, had observed other children receiving:
The thing is I asked for the services and the deal is you don't take kids away the families who have sick children, they're getting services. They're getting a house, they're getting nurses coming into the house, they're getting therapy, multiple therapyit didn't happen to me. My kids were taken away.
....
I used to work with the kids, parents working, they have a nurse 24 hours a day in their house provided by DYFS. Okay. Bayada nurses, they have therapy, they have respite care. They have all kinds of services. They just don't gothey are autistic kids to explain why my kidsthey don't just take kids away. They place the help. They help them, so they place the person. And this is what I was asking about.
Defendant's attorney requested a short return date, with the Division being directed to explore residential placement "with an agreement in place that would allow [defendant] to be helped through some facility" and also with the understanding that there would be "a limited period in which [the Division] remained in her life."
The court entered its findings, under Title 30, that defendant was unable to keep the twins safe from each other and others safe from them, and ordered that the custody, care, and supervision of the twins be placed with the Division. The court instructed the Division to seek a residential treatment program as quickly as possible, and because defendant consented to a psychological evaluation, the order included a provision for defendant's psychological evaluation.
When the matter was before the court the following month on October 29, the Division reported to the court that the twins had been accepted to the Holley House Center (Holley House), an eighteen to twenty-four-month residential treatment center. Defendant's attorney confirmed her client's approval of the placement. E.S. appeared at this hearing and, through counsel, requested that he be awarded custody of the children upon their discharge from the residential facility. The court indicated that it was not making any custody determination until the children completed their treatment in the residential facility. The court also learned that I.S. had undergone a psychological evaluation. Although the results were not available for the hearing, a report issued thereafter was essentially unremarkable except for test results of I.S.'s stress level, which reportedly was "off the charts." The twins were placed in Holley House on November 1, 2007. S.S. remained at the facility until early 2009 and N.S. remained until later that year.
The court conducted a fact-finding hearing on January 11, 2008, and rendered an oral decision on January 17, finding that "under Title 30 neither parent has the *1220 ability at this time to care for or meet the needs of both [of] these twins." The court expressly found that the evidence was insufficient to establish that either parent had abused or neglected the girls. The court continued the custody, care, and supervision of the children with the Division.
In September 2008, the Division presented its first Title 30 permanency plan to the court. The plan recommended that S.S. be placed with E.S. and individual stabilization of N.S. upon completion of a residential program. The court accepted the permanency plan finding:
[O]n the basis of the information that I have today[,] I am satisfied that the permanent plan for both girls, that being with [N.S.,] which is individual stabilization upon completion of a residential program[,] is appropriate and acceptable[,] and with [S.S.,] the reunification with [E.S.], again upon completion of the residential treatment program[,] is appropriate and acceptable.
....
I am satisfied that it is not and will not be safe to return the children home in the foreseeable future with respect to [N.S.] because she is in a program, is not making the necessary progress that would allow her to safely be returned to either one of her parents.
With respect to [S.S.,] I'm satisfied that the conditions or circumstances leading to the removal of [S.S.] are being corrected and that it will be safe within the time frames, because she will have completed her residential program, and [E.S.] will have been involved with her in therapy and that is where she wants to go.
I'm satisfied the Division has made reasonable efforts to finalize the permanent plan and that includes psychological individual counseling, parenting skills for [I.S.], psychologicaltwo psychological evaluations and family therapy for [E.S.] and a host of services for the girls including therapy, art therapy, and the Audrey Hepburn House and the psycho-social for [N.S.] Okay?
This is an exception to the requirement to file a termination of parental rights for the following compelling reasons which is that both girls have significant emotional problems and are currently in a residential facility and the plan is not termination of parental rights at this point but reunification with their parents at the appropriate time.
Defendant objected to the plan to place S.S. with E.S. and also objected to having to travel to Pennsylvania to visit with S.S., although the court found she essentially traveled the same distance when visiting N.S. at the residential facility. S.S., in accordance with the permanency plan, was placed with E.S. in March 2009. On August 26, 2009, the court accepted the permanency plan for N.S. that called for her to be returned to her mother following her discharge from the residential treatment facility:
I'm satisfied that the conditions or circumstances that led to the removal of the child are being corrected and that it will be safe to return the child home because she has received, meaning [N.S.] hasexcuse me, received various psychological, psychiatric evaluations, sex abuse therapy, psycho/social evaluation and she has been receiving treatment at the Holley Center for quite a period of time.
In addition to that[,] the mother has received a psychological evaluation and she has followed through with parenting classes and there are services that will continue to be in place, will be provided through DDD and YCS.
I'm satisfied also that reasonable efforts to finalize the permanent plan are *1221 appropriate as I have indicated the services that have been provided. This is an exception to the requirement to terminate parental rights in that [N.S.] is [eleven] years old, she does not wish tofor parental rights to be terminated and a transition is being implemented. She also has ... exhibited serious acting out and behavioral problems in the past which would not make her a good candidate for adoption at this time.
On October 29, 2009, the court conducted a compliance review hearing during which it advised that the litigation needed to be terminated at some point and that since "one of the children has been placed with the parent from [whom] the child was not taken from, we have to have a hearing." The court scheduled the hearing for January 8, 2010, and directed the parties to exchange discovery and to exchange their witness list one week prior to the hearing.
The hearing commenced on January 27, rather than January 8. At the outset, the court advised the parties that it was going to "set the parameters of what this hearing is about in accordance with G.M.":[1]
What this [c]ourt must first determine is whether it is safe to return the children home and then, since there is a custody matter, determine whether there's ... been a substantial change in circumstances.
If the answer to that is, "yes," then we get into the custody hearing. Okay?
So, just keep that in mind when everybody's asking their questions and trying to present because this [c]ourt has to make specific findings with respect to the safety of the children to go home and the substantial change in circumstances from the time of the removal of the children to the present time, okay?
And, I'm trying to think way back substantial change in circumstances since September of '07.
The law guardian presented Dr. Ronald Gruen, a psychologist retained on behalf of the girls, who conducted a bonding evaluation between S.S. and E.S., and S.S. and I.S. Before Dr. Gruen commenced his testimony, however, defendant requested an adjournment of the matter in order to retain her own expert. Her attorney explained that defendant had just learned that the report was "unfavorable" and wanted an opportunity to retain a "parental alienation syndrome expert." The court agreed to adjourn the matter but took Dr. Gruen's testimony at that time since the doctor was present and prepared to testify. Throughout Dr. Gruen's testimony, defendant repeatedly interrupted despite admonishments from the court.
In his testimony, Dr. Gruen expressed the opinion that it would be psychologically unsafe for S.S. to live with I.S. He reached this conclusion based upon the bonding evaluation he conducted, and described to the court the observations he made:
Q Dr. Gruen, why would it be psychologically unsafe for [S.S.] to live with her mother?
A Well, because I think right now there'd be a lot of fighting between the two of them[,] [I.S. and S.S.] and behind closed doors[,] who's to know what's going on.
I mean, I was a witness to what was... argued about.
Now, you know, Mom is in control of her own house. She closes the door, there's no witness to what's going on between her and [S.S.] And, you know, I... just think that [S.S.] would be ... *1222 talking back and Mom would get very angry and it would escalate very quickly.
Q Dr. Gruen, would it bewould you say that when people come to see you for evaluations, they usually try to put their ... best forward?
A Yes.
Q And, what does that say to you when ... [I.S.] came to see you[,] that this is how she acted in front of you?
A I would worry what's going to happen when I'm not there[,] when it's notthere's no witnesses.
Q There's no psychologist sitting in the room with her.
A Correct.
In Dr. Gruen's opinion, E.S. was in a much better position to address S.S.'s needs than I.S. He expressed the view that I.S. "was more interested in being right and being heard and sort of overriding [S.S.] and what her feelings and her expressions were."
Upon completion of Dr. Gruen's testimony, the court adjourned the proceeding until March, but the hearing was rescheduled from that date because defendant retained new counsel and had not yet retained an expert. When the hearing resumed on June 24, defendant did not produce an expert witness. Kay Anderson, an investigator from the law guardian's office, testified regarding the home inspection she conducted of E.S.'s residence, which she found to be appropriate. She also reported that S.S. was receiving specialized services through the school system. E.S. testified that S.S. was doing well and that he was receptive to all services that she would need. I.S. did not testify or produce any witnesses or other evidence.
At the conclusion of the hearing, the court placed its decision orally on the record and focused upon two issues: (1) whether it would be safe to return S.S. to I.S.; and (2) whether it was in S.S.'s best interest to be placed in I.S.'s custody. The court concluded that it was neither "safe to return S.S. to her mother's care nor to award custody of S.S. to I.S." In reaching its decision, the court credited Dr. Gruen's testimony and also noted its observations of I.S. throughout the course of the proceedings during which defendant repeatedly interrupted the hearings and appeared confrontational before the court.
The court then engaged in a "best interest analysis," reviewing, for guidance, some of the statutory factors set forth under N.J.S.A. 9:2-4(c) that courts must consider in rendering custody determinations. The court found that neither I.S. nor E.S. had the ability to agree, communicate or cooperate regarding S.S., but noted that E.S. made efforts to facilitate parenting time for defendant. The court also found that I.S. demonstrated she would not allow parenting time between E.S. and S.S. Additionally, the court noted that S.S. had substantially improved while in E.S.'s care, and expressed her desire to live with E.S. rather than I.S., even if that meant she would not see N.S. The court noted further that S.S. had not had substantial contact with I.S. since her release from the residential treatment center, E.S. was a fit parent, and that I.S.'s home environment would not benefit S.S. The court expressed that it had "no doubt if [S.S.] were to go back with her mother, she would go back into a residential facility in no time."
After considering these factors, the court entered an order that S.S. "remain in the legal and physical custody of E.S." and that N.S. remain in the "legal and physical custody of I.S." The court made no order as to visitation. It explained:
With respect to parenting time, and this is something that this [c]ourt maybe *1223 has done once before, and ... this [c]ourt does it with a heavy heart. I am not granting parenting time to either parent with the other child unless they agree to it amongst themselves.
I don't believe that [I.S. is] ever going to end this and think that with respect to [S.S.], it's just going to be harmful for her to continue to have contact with her mother.
....
I'm not forbidding any contact, and I want to make that clear. I am not forbidding any contact. I'm just not establishing ... a parenting time order.
On appeal, defendant contends "[t]he trial court's findings should be reversed and S.S. returned to [her] custody because, under N.J.S.A. 30:4C-12 criteria, the Division did not prove that [she] was unable to provide the appropriate level of care to ensure the health and safety of her children." We reject this contention and conclude there was substantial credible evidence, clearly and convincingly demonstrating that returning S.S. to I.S. was not in S.S.'s best interest.

I.
We begin by noting that the facts in this matter are largely undisputed. The record amply demonstrates that I.S. was affirmatively engaged in seeking help for her daughters, but prior to the Division's involvement, she had been unsuccessful in her effort to have them placed in an appropriate residential facility where they could get the necessary help. It is also undisputed that the twins suffered from serious behavioral problems. I.S. acknowledged that she had been unable to prevent them from acting out. Many of the incidents of acting out occurred while I.S., a nurse, was at work and the twins were in the care of I.S.'s parents, who were in their seventies at the time.
"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279, 914 A.2d 1265 (2007). That right, however, is not absolute, and "must be balanced against the State's parens patriae responsibility to protect the welfare of children." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605, 926 A.2d 320 (2007) (citation and internal quotation marks omitted).
N.J.S.A. 30:4C-12 authorizes the Division to seek an order placing a child under its care and supervision or granting the Division custody of a child when a parent "shall fail to ensure the health and safety of the child," and after an investigation, to be awarded care and supervision or custody of a child in order to "ensure the health and safety of the child." I.S.'s actions in taking the girls to the Virtua Hospital emergency room because she wanted them to get help, even if she did so based upon advice from DDD, supports the court's finding that defendant lacked the ability to care for S.S. and N.S. at the time they were removed from her custody. Defendant expressed her desire to have the children placed in a residential facility at the initial OTSC hearing conducted on September 24, 2007. At that time, the court found that defendant "is unable to keep the children safe from each other and others safe from the children." The court also stated that it was not making a finding of abuse or neglect and expressed its belief that it appeared that defendant was "trying to get some help for her children." The following month, defendant's attorney reiterated to the court that it was defendant's desire to have the girls placed in a residential treatment facility, which occurred a few days later.
When the court conducted its fact-finding hearing in January 2008, defendant's *1224 defense focused upon the absence of any evidence of abuse or neglect. The court agreed that the State failed to prove that defendant abused or neglected her daughters but did not dismiss the complaint, thereby "inferentially conclud[ing] that its assistance was required[.]" N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 401, 968 A.2d 698 (2009) (noting that "because the trial court inferentially concluded that its assistance was required and also made a finding of abuse or neglect, dismissal was not appropriate."). In addition, beyond considering whether the State proved abuse and neglect under Title 9, the court, pursuant to Title 30, also considered whether I.S. and E.S. had the ability to care for or meet the needs of the twins and determined, by clear and convincing evidence that they could not. N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 113, 23 A.3d 352 (2011).
In essence, although designated as a fact-finding proceeding, the court presided over two statutorily similar but separate actions. The focus of proceedings initiated under Title 9 is assurance that "the lives of innocent children are immediately safe-guarded from further injury[.]" N.J.S.A. 9:6-8.8a. The focus of a proceeding brought pursuant to Title 30, however, is "whether or not it is in the child's best interest to preserve the family unit," with the child's health and safety being the paramount concern of our Legislature. N.J.S.A. 30:4C-1(a). Thus, a critical distinction between the two proceedings is the sense of urgency of proceedings commenced under Title 9, in contrast to proceedings commenced under Title 30, which may take place over a longer period of time in order to ensure the permanent safety and well-being of a child.
Thus, a fact-finding hearing is a statutorily mandated proceeding under Title 9 to determine whether a child has been abused or neglected. N.J.S.A. 9:6-8.44. At the fact-finding hearing, the State must prove, by a preponderance of the evidence, that there has been an act of abuse or neglect committed by the parent or other person charged with a legal duty of care for the minor child. N.J.S.A. 9:6-8.46. "If facts sufficient to sustain the complaint under [Title 9] are not established, or the court concludes that its assistance is not required on the record before it, the court shall dismiss the complaint and shall state the grounds for the dismissal." N.J.S.A. 9:6-8.50c (emphasis added). It is clear from this language that under Title 9, a court is not limited to a finding of abuse or neglect before exercising continuing jurisdiction over a proceeding instituted under Title 9. G.M., supra, 198 N.J. at 399-400, 968 A.2d 698. However, in the absence of a finding of abuse or neglect, the court must be satisfied its assistance is still required before continuing to exercise jurisdiction over the matter. N.J.S.A. 9:6-8.50.
On the other hand, a proceeding brought pursuant to Title 30 may arise out of myriad of circumstances that may be minimally intrusive, such as when the Division provides counseling and referral services to families in need; or, the Division's involvement may arise under more intrusive circumstances, such as when the Division effectuates an emergency removal or ultimately seeks guardianship and termination of parental rights. The latter proceedings "implicate core constitutional rights ... governed by the clear and convincing evidence standard." R.D., supra, 207 N.J. at 113, 23 A.3d 352.
As a practical matter, Title Nine and Title Thirty proceedings can be consolidated. See N.J.S.A. 9:6-8.24(e) ("Any [abuse or neglect] hearing held before the Family Part may serve as a permanency hearing for the child to provide *1225 judicial review and approval of a permanency plan if all the [review and approval] requirements [under Title Thirty] are met.").
[Id. at 113, 23 A.3d 352.]
Consequently, the court's jurisdiction here was appropriately grounded under two concurrent but separate statutory schemes. N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 559-60 (1994). Although the Division's burden of proof at a fact-finding hearing is the preponderance of the evidence standard, the court applied the Title 30 clear and convincing standard in finding that neither parent had the ability to care for or meet the needs of the twins at that point. There was substantial credible evidence in the record to support this finding, which is entitled to our deference. Such an approach is consistent with our general recognition that "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding," and the conclusions that flow logically from those findings of fact, rather than engaging in second-guessing. Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998).
What followed after the fact-finding hearing was a series of proceedings mandated under Title 9 or Title 30, or both: (1) permanency hearings under Title 30; (2) dispositional hearings under Title 9; and (3) compliance review proceedings and custody determinations under both Title 9 and Title 30.
Just shy of one year following the twins' removal from I.S.'s custody, the court conducted a permanency hearing and approved the recommended permanency plan for the twins. N.J.S.A. 30:4C-61.2. Additional permanency hearings were held thereafter, and on August 26, 2009, the court conducted another permanency hearing in anticipation of N.S.'s release from the residential treatment facility. Upon its conclusion, the court approved the recommendation that N.S. be returned to I.S.'s custody.
On January 27, 2010, the court commenced what it characterized as a "GM/custody/disposition" hearing that it conducted over two non-consecutive days. The dispositional hearing, like a fact-finding hearing, finds its legitimacy under Title 9. Its purpose is to determine whether a child who has been in the care, supervision, and custody of the Division "may be safely returned to the custody of the parent from whom the child was removed." N.J. Div. of Youth & Family Servs. v. N.D., 417 N.J.Super. 96, 107, 8 A.3d 809 (App.Div.2010) (citing G.M., supra, 198 N.J. at 402, 968 A.2d 698).
Following the dictates of G.M., the court first determined that it was not safe to return S.S. to I.S. When a court determines that a child may not be safely returned to the parent from whom the child has been removed, the court may proceed with a guardianship action and termination of parental rights. R.D., supra, 207 N.J. at 121-22, 23 A.3d 352. An exception to initiating such an action exists when "the child's needs for stability and attachment" are met by the non-custodial parent or other relative. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 609, 512 A.2d 438 (1986) (quotation and internal quotation marks omitted).
This is precisely what occurred here. Dr. Gruen expressed the opinion that it was "psychologically unsafe" to return S.S. to I.S. That opinion, which the court credited, did not lead the court to conclude that termination of parental rights should be initiated. Rather, the court expressly noted that S.S.'s needs were being met by a non-custodial parent. Ibid. It was therefore appropriate for the court to then consider, *1226 as part of its "best interests" analysis, those factors a court would typically consider in making any custody determination, as outlined in N.J.S.A. 9:2-4.
In that regard, the court found that there was no ability between the parents to communicate with each other, notwithstanding that E.S. attempted to facilitate parenting time and to communicate with I.S. since S.S. had been in his custody. The court found that the evidence indicated that S.S. had made great progress while living with E.S. The court specifically noted that S.S. had gone from being uncontrollable in the community and requiring residential placement, to being part of the community and doing well in school. Further, the court found that S.S. was not exhibiting any behavioral problems that E.S. could not handle. The court surmised that S.S. probably wanted contact with her sister, but that would require unwanted interaction with her mother. The court also noted that S.S. "has made it absolutely clear" that "[n]ot only does she want to reside with her father, she does not wish to have contact with her mother." The court indicated that because S.S. was nearly thirteen years old, it would take her wishes into account. Finally, the court noted that I.S. had refused to travel to Pennsylvania to visit with S.S. since she was discharged from the residential facility and living with E.S.
We are satisfied the court's custody determination, informed by the court's consideration of S.S.'s best interest, was also supported by substantial credible evidence in the record, and those findings are also entitled to our deference. Cesare, supra, 154 N.J. at 413, 713 A.2d 390. Nor did the proceedings suffer from any of the procedural infirmities that the Court, in R.D., found militated against according preclusive effect to a finding of abuse and neglect in a Title 9 proceeding for purposes of satisfying the first prong of a termination of parental rights proceeding under Title 30. R.D., supra, 207 N.J. at 110-11, 23 A.3d 352.
Defendant was on notice at the October 29, 2009 compliance review hearing that the court would be conducting a hearing to address the custody of S.S. because S.S. was not returned to defendant's custody upon her discharge from Holley House. When the hearing commenced on January 27, 2010, the court announced that the purpose of the hearing was to determine whether it was safe to return the children and, since "there is a custody matter, determine whether there's... been a substantial change in circumstances." The court alerted the parties that in conducting the proceedings, it would be guided by G.M. Then, at defendant's request, the court adjourned the hearing after Dr. Gruen completed his testimony. Despite having the benefit of Dr. Gruen's testimony and expert report, and what turned out to be an additional six months in which to retain an expert, defendant returned to court in June without having retained an expert to rebut any of Dr. Gruen's opinions.
To summarize, we are satisfied that there were no procedural or due process infirmities resulting from the court simultaneously presiding over Title 9 and Title 30 proceedings throughout the course of the proceedings. Defendant was represented by counsel throughout the three years that the matter was pending before the Family Part. Defendant had ample notice of all proceedings and the nature of the proceedings to be conducted at each hearing. Defendant was afforded full discovery of reports and other documents upon which the Division relied in all proceedings before the court. The court applied the requisite evidentiary burden of *1227 proof standards and, at the fact-finding proceeding where the standard of proof is only by a "preponderance of evidence," the court applied the "clear and convincing" burden of proof standard.
While the Title 30 and Title 9 proceedings overlapped, the court carefully navigated through the proofs required to prove the allegations alleged under each statute, and applied the appropriate standard of proof in determining whether the Division satisfied its burden in connection with both actions. While we owe no special deference to the court's legal conclusions, we are in agreement with those conclusions. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). Once again, this case illustrates the parallel but not necessarily "congruent tracks of Title 9 and Title 30 proceedings[,]" which prompted the Supreme Court's suggestion that the Legislature "combine both avenues of child advocacy under a single title[.]" In re Guardianship of G.S., III, 137 N.J. 168, 179, 644 A.2d 1088 (1994); see also New Jersey Div. of Youth & Family Servs. v. A.P., 408 N.J.Super. 252, 265, 974 A.2d 466 (App.Div.), certif. denied., 201 N.J. 153, 988 A.2d 1176 (2009).

II.
Although not separately addressed in point headings in accordance with Rule 2:6-2, defendant contends the entry of a no visitation order is the equivalent of a "de facto" termination of her parental rights. The record clearly indicates that S.S. had no desire to visit with I.S., and N.S. had no desire to visit with E.S. Both girls held to this view, notwithstanding nearly two years of therapeutic treatment in a residential facility and continuing treatment on an outpatient basis. At the time of the June 24, 2010 hearing, the twins were nearly thirteen years old. The same judge who presided over the matter for a number of years determined that coerced visitation was not in the best interests of the children and declined to enter an order compelling visitation with either parent. The trial judge's "feel of the case" is entitled to our deference on this issue. N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104, 952 A.2d 436 (2008).
Defendant also contends the court's findings should not have included its assessment of defendant's in-court behavior. Based upon our review of the record here, we are satisfied the court did not err in considering defendant's in-court behavior.
Dr. Gruen testified that defendant exhibited confrontational behavior toward S.S. during the bonding evaluation, which led to his concern as to how defendant would act toward S.S. behind closed doors. There was also other evidence presented that defendant, on occasion, displayed similar qualities during her interactions with staff at the Holley House Center. In State v. Adames, 409 N.J.Super. 40, 60, 975 A.2d 1023 (App.Div.), certif. denied, 200 N.J. 504, 983 A.2d 1112 (2009), we recognized "the impossibility of eliminating the jury's consideration of a non-testifying defendant's demeanor and behavior during trial[.]" We emphasized this impossibility must not open the door to improperly considering a defendant's behavior or demeanor which occurs when the conduct is not an unsworn attempt to influence the jury. Ibid. These cautionary instructions apply to a trial judge when the judge is the trier of fact. The record here reveals that defendant, who was represented by counsel throughout most of the proceedings that occurred following the removal of the children from her custody, repeatedly ignored admonishments by the court and deliberately injected her unsworn comments *1228 into the various proceedings. During the fact-finding hearing, she interrupted witnesses and openly challenged their testimony. She also continuously voiced her disagreement with representations being made to the court by counsel. It is evident from the record that defendant's conduct was an "unsworn attempt" on her part "to influence the [trier of fact]." State v. Rivera, 253 N.J.Super. 598, 604, 602 A.2d 775 (App.Div.), certif. denied, 130 N.J. 12, 611 A.2d 650 (1992). The court's consideration of defendant's behavior under these particular circumstances, is understandable. Assuming, however, the court erred in considering defendant's unsworn conduct, the error was harmless. There was Dr. Gruen's testimony describing defendant's conduct during the bonding evaluation, which the court credited, and other evidence admitted, without objection, to support the court's findings. At best, the court's consideration of defendant's conduct merely corroborated the competent evidence already before the court.
Affirmed.
NOTES
[1] N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 968 A.2d 698 (2009).