# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2869-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

I.J.,

     Defendant-Appellant,

and

J.S.,

     Defendant.

_____

IN THE MATTER OF Z.-A.J.,
a minor.

_____

     Submitted October 7, 2020 – Decided  November 19, 2020

     Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0305-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Carol L. Widemon, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Lisa J. Rusciano, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant I.J. (Irene),[1] the mother of Z.-A.J. (Zoe), appeals from a Family Part judge's September 28, 2018 order finding that Irene abused or neglected her child. She also appeals the judge's January 24, 2019 order terminating the FN litigation; awarding continued sole physical custody of Zoe to her biological father Joseph; awarding joint legal custody to defendant, with the exception that any

---

[1] To protect privacy interests and for ease of reading, this court uses initials and pseudonyms for the parties and the children. R. 1:38-3(d)(12).

medical decisions be made solely by Joseph; and indefinitely suspending defendant's visitation with her child until she could demonstrate changed circumstances.

Plaintiff, the Division of Child Protection and Permanency (Division), initiated this case as a Title Thirty action for care and supervision under N.J.S.A. 30:4C-12. The Division later amended the complaint to include a count of child abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c). The Division filed the amended complaint after Irene[2] was diagnosed with a psychiatric disorder encompassing a differential diagnosis of factitious disorder imposed on another (FDIA).[3] The FDIA

---

[2] The Law Guardian does not appeal the judge's termination of the litigation and her indefinite suspension of visitation absent a showing of changed circumstances.

[3] As we have previously explained,

> [w]hat [was] usually referred to as "Munchausen Syndrome by Proxy," [and now] more recently, [FDIA], is a mental illness by which a person caring for another, often a child — in seeking attention — acts as if the cared-for individual has a physical or mental illness. Its effect on the cared-for individual results from the obstacles it creates for health care providers striving to identify the cared-for individual's nonexistent illness, thereby making the matter worse.
>
> [N.J. Dep't of Children & Families v. L.O., 460 N.J. Super. 1, 4 n.1 (App. Div. 2019).]

A-2869-18T4

diagnosis was confirmed prior to the dismissal of the Title Thirty litigation by defendant's own treating psychiatrist. On appeal, Irene argues that expert testimony was required to sustain a finding of abuse or neglect. She also appeals the indefinite suspension of her visitation, characterizing it as a de facto termination of her parental rights. Finding no merit in these assertions, we affirm.

We discern the following facts from the record. Irene and Joseph, who have never been married, are the biological parents of Zoe, who was born in April 2015. Irene has a significant documented history of untreated mental illness, dating back to at least February 2009, when at the age of fifteen she was twice hospitalized for depression and suicidal ideation.

Both before and after Zoe's 2015 birth, Irene exhibited a pattern of expressing bizarre and delusional beliefs that, upon investigation by the Division, proved to be false. In March 2010, the Division received a referral from a High Focus social worker, reporting that Irene had written a letter in which she alleged her father was sexually abusing her. Questioned by the Division, Irene stated she had written the letter a long time ago after "having a

---

FDIA is found "when someone falsely claims that another person has physical or psychological signs or symptoms of illness, or causes injury or disease in another person with the intention of deceiving others." Factitious Disorder, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/factitious-disorder/symptoms-causes/syc-20356028 (last visited Nov. 4, 2020).

A-2869-18T4

dream about it," and she denied ever being physical abused. In March 2012, Irene falsely claimed she had been handcuffed in a basement with a "sick and deceased" two-year-old child.

On January 17, 2018, the Division received two separate referrals that Irene had twice started fires in her apartment, with the callers raising concerns about Irene's mental health and Zoe's safety. Irene denied having any mental health issues and claimed her parents "affixed" a depression diagnosis to her when she was young. Irene admitted she had been diagnosed with a mood disorder and depression for which she had been prescribed Zoloft and Lexapro; however, she refused to take her prescribed medication.

Irene advised the Division caseworker that Zoe's father was F.D., to whom she claimed to be married.[4] She claimed that she and F.D. had three additional children.[5] Irene stated that all the children were born at Overlook Hospital and that all three had died from heart complications when they were four to six

---

[4] Irene filed an application for child support against F.D. in Union County, which was dismissed after it was discovered Irene had no children other than Zoe (9T23:9-24).

[5] On December 19, 2017, Irene contacted the court to adjourn a scheduled hearing, claiming her twin children were in the NICU and she need a court order so that a phlebotomist could conduct a paternity test. (9T23:11-15).

months old. The Division's investigation of this claim, however, revealed that Zoe was Irene's only child, and that Joseph, not F.D., was Zoe's father.

During its investigation, the Division received collateral reports documenting medical concerns for Zoe. Dr. Rajeshwari Mahalingham,[6] a pediatric neurologist, confirmed that he had treated Zoe for epilepsy and developmental delays including language delay and autism. He had previously recommended a follow-up video EEG to confirm and classify her seizure disorder but Irene had not scheduled it yet.[7] That same day, the Division contacted Zoe's dentist, Dr. Mehdi, who reported that she had nine decayed teeth and poor dental hygiene. Mehdi reported that because of Zoe's history of seizures, the cavities should be filled in a hospital setting, but that Irene would not consent to such a procedure.

Due to growing concerns about Irene's mental health and Zoe's safety in her care, the Division successfully petitioned the court for custody on February

---

[6] The spelling of this doctor's name varies throughout the record.

[7] The EEG was completed after the Division obtained custody, and the results were normal. Zoe was then weaned off her seizure medication, Keppra.

A-2869-18T4

8, 2018.[8]  The Division placed Zoe with Irene's mother.  Both Irene and Joseph were allowed supervised visitation.[9]

On February 14, 2018, Irene completed the first half of a two-part psychological evaluation; the second half was scheduled for February 21, 2018.[10]  Dr. Brody's report opined that Irene experienced "delusional thinking, paranoia withdrawal, and [] persecutory ideas."  Brody recommended a psychiatric evaluation, weekly therapy, a parenting course, and that Irene attend all of her medical and mental health appointments.

Pursuant to Dr. Brody's recommendation, the Division arranged for Irene to participate in an evaluation with Dr. Samiris Sostre, a psychiatrist.  Sostre provided a differential diagnosis of "rule out [u]nspecified [p]sychotic [d]isorder," "rule out [d]elusional [d]isorder, mixed type, with erotomatic and paranoid delusions," "rule out [f]actitious disorder imposed on another (previously Munchausen's by proxy)," and "rule out [p]seudologia [f]antastica."

---

[8]  In May 2018, the Division filed an amended complaint to add counts for abuse and neglect under Title 9.

[9]  Irene's initial visits with Zoe was unsuccessful, as the police were summoned to the visit on February 11, 2018, after Irene alleged that the maternal grandmother was part of a plot to take away her child.

[10]  The record is unclear as to whether Irene ever completed the second-half of her psychological evaluation.

Sostre found that Irene's "beliefs represent fixed beliefs that are not true" and that she "completely believes to be true" resulting in delusions. Sostre concluded that Irene's reports involve a "coexistence of lies and delusions" and that she had created "a false world." Irene's behaviors "are motivated by psychiatric reason, though her exact diagnosis is unclear." Significantly, Irene "does have a mental illness that involves some detachment from reality that is interfering with her ability to care for her child." Sostre recommended that Irene see a therapist on a regular basis and follow up with a psychiatrist.

Irene completed a voluntary psychiatric evaluation with Dr. Manfred Obi, a psychiatrist of her choosing. On October 5, 2018, Dr. Obi issued a status update and reported that Irene was doing well with treatment, but nonetheless stated that he had diagnosed her with "Munchausen [s]yndrome by [p]roxy which is very dangerous for the child," otherwise known as FDIA. This diagnosis corroborated Sostre's earlier conclusion that Irene might suffer from factitious disorder. Obi also expressed "concerns" about Cluster B traits including "[m]anipulations, lack of [e]mpathy, [s]eeking [a]ttention, [f]alsehood and [s]elf [d]ramatization."

A-2869-18T4

On September 21, 2018, the court held both a Title 9 fact-finding hearing, and a Title 30 dispositional hearing.[11] (8T). Neither Irene nor the Law Guardian offered any testimonial or documentary evidence in connection with the fact-finding. At the fact-finding hearing, the Division caseworker testified as to the history of the Division's involvement with Irene and records of Zoe's pediatric neurologist and dentist were admitted.

At the Title 30 dispositional hearing, Dr. Sostre testified as an expert in psychiatry. Sostre testified to a reasonable degree of medical probability that Irene suffers from a psychotic condition and provided a differential diagnosis of psychotic disorder; delusional disorder; factitious disorder by other; and pseudologia fantastica. Sostre testified that Irene's judgment is impaired because of her mental illness, particularly through a lack of attention to Zoe and her well-being. Significantly, she testified that Irene's mental illness would interfere with her ability to care for Zoe, and that Zoe would be at risk of harm in Irene's care.

Sostre was particularly concerned about Irene's factitious disorder, because despite Irene's earlier reports that Zoe suffered from a seizure disorder,

---

[11] On July 27, 2018, the court ruled that Sostre's evaluation and testimony would not be admitted into evidence at the fact-finding hearing to prove abuse or neglect. The Division has not cross-appealed from the ruling.

A-2869-18T4

the eventual EEG was normal, and Zoe did not suffer seizures when living with the maternal grandmother, despite not taking medication. Sostre expressed doubt as to whether Zoe actually had a seizure disorder.

On September 28, 2018, the judge issued an oral decision and order finding that Irene abused and neglected Zoe under N.J.S.A. 9:6-8.21(c), as Irene's failure to acknowledge and address her mental illness placed Zoe at risk of harm.[12]

On January 24, 2019, the court approved the Division's plan for Zoe's continued placement with Joseph, finding that he provided a "safe and stable home" for Zoe. The court found that it was not safe to return Zoe to Irene, "as she has been diagnosed with factitious disorder by other, as well as depressive disorder and personality disorder by her own doctor [Obi]." The court noted that, at the time of the hearing, there was no evidence showing that she was under the care of a psychiatrist for treatment. The court found that the Division had used reasonable efforts to provide services to the family. The court also found that the objective of obtaining permanency for Zoe had been achieved through her placement with Joseph, and that dismissal was appropriate. The

---

[12] The court had previously ordered that Zoe be placed with her biological father Joseph, after the Division determined him to be an appropriate placement

court entered a compliance review order which suspended Irene's visits indefinitely. The court stated that Irene was free to initiate a subsequent proceeding to seek visitation, on notice to the Division, if she could show changed circumstances.

## A.

On appeal, Irene argues that the judge erred in finding that she abused and neglected Zoe because there was no competent proof that she posed a substantial risk of imminent harm to her daughter. She also contests the indefinite suspension of her visitation as a de facto termination of her parental rights. We find these arguments to be without merit and affirm.

Our review of a Family Part judge's determination in custody and parenting-time matters is limited. We "accord deference to family [judges'] factfinding[s,]" "because of the family [judge]s' special jurisdiction and expertise in family matters." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Indeed, a Family Part judge must "frequently . . . make difficult and sensitive decisions regarding the safety and well-being of children." Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007). We have "invest[ed] the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best

interests of children." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 365 (2017) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012)).

A trial court's findings of fact in an abuse and neglect proceeding are entitled to deference, and will be upheld on appeal if they are supported by adequate, substantial, and credible evidence in the record. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007); N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002). However, we "owe no special deference to the trial judge's legal determinations." Slawinski v. Nicholas, 448 N.J. Super. 25, 32 (App. Div. 2016) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

N.J.S.A. 9:6-8.21(c)(4) defines an abused and neglected child in relevant part as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by

any other acts of a similarly serious nature requiring the aid of the court. . . .

"[A] psychiatric disability can render a parent incapable of caring for his or her children." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 94 (App. Div. 2008). Although mental illness, alone, does not disqualify a parent from raising a child, it is a different matter if a parent refuses to treat or even acknowledge their mental illness. See F.M., 211 N.J. at 450-51.

In this case, the judge's finding that Zoe is an abused or neglected child is abundantly supported by substantial credible evidence in the record. Dating back to Irene's earliest involvement with the Division in 2012 when she was a teenager, she has consistently and categorically denied any psychiatric condition, claiming instead that her parents "affixed" a diagnosis to her in her youth that is no longer warranted. Despite the Division's ongoing efforts to offer her services, Irene has never meaningfully engaged in any treatment designed to address her obvious bizarre and delusional beliefs and behaviors.

In that regard, we reject Irene's assertion that expert testimony was required to establish that Irene's behavior placed Zoe at imminent risk of harm. See N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 29 (2013) ("To be clear, we do not require expert testimony in abuse and neglect actions. In many cases, an adequate presentation of actual harm or imminent danger can be made

without the use of experts."). As the judge recognized, Irene's underlying behavior demonstrated a continuing deterioration of her mental health over time that required treatment. Her refusal to obtain that treatment, coupled with her increasingly bizarre and irrational behavior, suggesting that Irene cannot separate fantasy from reality, unquestionably placed Zoe at substantial risk of harm. We see no reason to disturb the judge's determination, given her thorough familiarity with the case and our deferential standard of review. See M.M., 189 N.J. at 279.

B.

We also reject Irene's assertion challenging the dismissal of the Title Thirty action. In a Title Thirty action for care and supervision, the Division is authorized to intervene when "a child who, although not abused or neglected, [may be] in need of services to ensure [his or her] health and safety." N.J. Div. of Youth & Family Servs. v. T.S., 426 N.J. Super. 54, 64 (App. Div. 2012). The Division may seek a "court order to intervene and require a [parent or guardian] to undergo treatment, or seek other relief, if the best interests of the child so require." A.L., 213 N.J. at 9.

Once a judge determines the Division's supervision or care is no longer needed, the judge should dismiss the matter, T.S., 426 N.J. Super. at 66, and conduct a dispositional hearing "to determine whether a child who has been in the care,

supervision, and custody of the Division 'may be safely returned to the custody of the parent from whom the child was removed.'" N.J. Div. of Youth & Family Servs. v. I.S., 422 N.J. Super. 52, 70 (App. Div. 2011) (quoting N.J. Div. of Youth & Family Servs. v. N.D., 417 N.J. Super. 96, 107 (App. Div. 2010)), opinion clarified on denial of reconsideration, 423 N.J. Super. 124 (App. Div. 2011), aff'd in part, rev'd in part, N.J. Div. of Youth & Family Servs. v. I.S., 214 N.J. 8 (2013).

Where, as here, the child cannot be safely returned, the Division may consider other relative placements as an alternative to termination of parental rights. The Division achieved permanency for Zoe through the child's placement with her biological father. Zoe was thriving in his care according to the Division, the Law Guardian, and a CASA volunteer. Thus, there was no need to keep the Title Thirty litigation open indefinitely to facilitate visitation considering Irene's persistent refusal to engage in services to facilitate reunification. Nonetheless, her parental rights remain intact as she retains limited joint legal custody, and the right to petition the court for visitation, on notice to the Division, should she be able to demonstrate changed circumstances. We see no error requiring our intervention.

To the extent we have not specifically addressed any of the remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-2869-18T4

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2869-18T4