# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2058-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

B.H.,

     Defendant-Appellant,

and

C.A., Sr.,

     Defendant-Respondent.

_____

IN THE MATTER OF C.A., Jr.,

     a Minor.

_____

Submitted February 10, 2020 – Decided June 19, 2020

Before Judges Rothstadt and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FN-15-0120-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Clara S. Licata, Designated Counsel, on the briefs).

Greenbaum Rowe Smith and Davis, attorneys for respondent C.A., Sr. (Jeanette Russell, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Division of Child Protection and Permanency (Jane C. Schuster, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David Ben Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

In this Title Thirty action for care and supervision, N.J.S.A. 30:4C-12, filed by plaintiff, the Division of Child Protection and Permanency (Division), the subject child, C.A., Jr.'s (Cody), natural mother, defendant B.H. (Beth),[1] appeals from the Family Part's August 29, 2018 and December 4, 2018 orders

---

[1] To protect privacy interests and for ease of reading, we use initials and pseudonyms for the parties and the child. R. 1:38-3(d)(12).

terminating the action and continuing Cody in the physical custody of his natural father, defendant C.A., Sr. (Carl) as he had been for the preceding two years. On appeal, Beth argues that the judge failed to make sufficient findings as to whether it was in Cody's best interests not to be reunified with her, that the evidence did not support her not being reunified with her child, that the litigation should not have been terminated, and that there was no need for supervised visitation because she had a "good relationship" with her son. We affirm.

## I.

The Division became involved with Beth and Carl due to concerns about Beth's volatile and aggressive behavior. About two weeks after Cody's birth,[2] on October 27, 2015, Carl contacted the Division and reported that Beth was "out of control." She had allegedly used Cody's baby seat "as a battering ram" to open a door while the child was in the seat. Carl reported that she was also throwing and breaking various objects in the home.

After investigating, the Division suggested a Safety Protection Plan that would have Cody and Beth live with her mother who would supervise Beth's

---

[2] Prior to Cody's birth, Carl and Beth were involved in a domestic violence matter in which they each obtained restraining orders against the other. After the orders were entered, Carl accused Beth of repeatedly violating the restraining order against her. However, before Cody was born, the orders were vacated and the parties resumed living together.

3

contact with Cody. Beth disagreed and stated that she wanted Carl's mother to supervise her visits, even though Beth was living with her mother. However, although those visits were arranged, the supervised visits ended within two weeks when Carl's mother advised the Division that Beth had anger issues, a volatile temperament, and that she no longer wanted to supervise Cody's contact with Beth.

On November 17, 2015, the Division filed this action. That same day, a Family Part judge entered an order to show cause granting care and supervision of Cody to the Division, ordering Beth to submit to a November 20, 2015 psychological evaluation, subjecting both parents to supervised contact with Cody, and ordering them to refrain from having any contact with each other. At the hearing, Beth consented to the Division obtaining care and supervision, a psychological evaluation on November 20, 2015, and having her mother supervise all visitation with Cody.

Giselle Colorado, Psy.D., conducted a psychological evaluation of Beth on November 20, 2015. Colorado concluded that Beth "demonstrated limited insight about her relationship with [Carl]." She described Beth's judgment and decision-making abilities as "emotionally immature" and recommended that Beth engage in weekly individual counseling.

A-2058-18T3

By December 16, 2015, the return date of the order to show cause, Beth's mother was living with her and supervising all of Beth's contact with Cody. The judge continued care and supervision with the Division, legal custody with Beth and Carl, physical custody with Beth under her mother's supervision, and visitation for Carl supervised by his mother. However, two weeks later, Beth's mother advised the Division that she no longer wanted to continue supervising Beth's contact with Cody.

Thereafter, physical custody of Cody was transferred to Carl. The court had previously authorized such a transfer of physical custody in its December 16, 2015 order, stating "[i]f/when maternal grandmother decides she no longer wishes to supervise visitation, custody of child to transition to [Carl] with [Beth] having ample visitation." Beth's visitation with Cody was to be held at the Division's offices twice per week, for two hours per visit. Beth's visitation was suspended on January 28, 2016, after she refused to release Cody at the end of a visit. The police were called, removed Cody by force, and Beth was arrested. Thereafter, Beth began therapy with Christine Lill, LCSW. She attended a total of seven sessions throughout January and February 2016.

On March 8, 2016, at what was to be a summary hearing, Beth's attorney requested that visitation be resumed once Beth was released from jail, as she

A-2058-18T3

was incarcerated for violating a restraining order that was issued by a municipal court judge. A different judge, the trial judge in this matter, adjourned the summary hearing and continued the suspension of Beth's visitation until she underwent a psychiatric evaluation. The judge ordered Beth and Carl to attend individual counseling, and ordered that Beth was to have no contact with Carl.

Beth was released from jail in April 2016. However, she violated a no-contact order and was incarcerated again before she was ultimately released on June 6, 2016. Three days later, Lill issued an updated therapy report stating that she recommended a psychiatric evaluation of Beth. Beth consented to a psychological and a psychiatric evaluation and the judge ordered that Beth's visitation would continue to be suspended until the Division's psychologist and psychiatrist both determined that Beth should have parenting time.

Melissa Rivera Marano, Psy.D., conducted a psychological evaluation of Beth on June 17, 2016. Marano found Beth "emotionally reactive and [that she] exercise[d] poor judgment." The doctor diagnosed Beth with Borderline Personality Disorder and stated that Dialectical Behavioral Therapy (DBT)[3] would be optimal for treatment.

---

[3] DBT "treatment is a type of psychotherapy—or talk therapy—that utilizes a cognitive-behavioral approach. DBT emphasizes the psychosocial aspects of

John Quintana, Ph.D., conducted a psychological evaluation of Beth on her behalf on July 1, 2016. Quintana found that Beth was "emotionally immature," could be inflexible in her views, and lacked insight. He concluded that Beth did not pose a serious danger to Cody as long as she and Carl remained apart. He diagnosed Beth with unspecified personality disorder with a dependent personality and borderline personality traits. He also recommended that Beth attend insight-oriented psychotherapy and counseling.

Beth also underwent a psychiatric evaluation conducted by Samiris Sostre, M.D., on July 5, 2016, on behalf of the Division. Dr. Sostre opined that Beth exhibited compulsive behaviors, hostility, poor impulse control, a lack of restraint, significant violation of boundaries, and unstable interpersonal relationships. She further stated that these behaviors were characteristic of borderline personality disorder. The doctor noted that Beth's symptoms were "severe" and that she had very little insight into how her own behaviors were perceived by others. She recommended that Beth not have visitations with Cody

---

treatment." John M. Grohol, Psy.D., An Overview of Dialectical Behavioral Therapy, PSYCHCENTRAL, https://psychcentral.com/lib/an-overview-of-dialectical-behavior-therapy/ (last updated May 17, 2020). According to DBT theory, "some people's arousal levels in such situations can increase far more quickly than the average person's, attain a higher level of emotional stimulation, and take a significant amount of time to return to baseline arousal levels." Ibid.

"as her ability to manage her anger, her impulses, and accept appropriate boundaries and rules [was] impaired . . . and her risk of unpredictable, inappropriate and possibly dangerous behaviors to her child [were] high."

Lill issued a report on July 29, 2016 describing her counseling sessions with Beth. She reported that Beth's treatment goals were not attained, in part due to Beth's unwillingness to trust her.

Beth filed a motion on August 9, 2016 to reinstate her visitation and to adjourn a dispositional best-interests hearing.[4] At the return date on October 7, 2016, concerns were raised about the Division's inability to confirm whether Beth was attending therapy. The judge found that it was not in Cody's best interests to reinstate Beth's visitation given her lack of cooperation with the Division and her mental health issues. The judge denied Beth's requests for supervised visits and adjourned the hearing.

On October 28, 2016, the judge began a Title Thirty summary hearing to determine if services were still needed, and a concurrent dispositional best-

---

[4] At a case management review hearing on July 8, 2016, Beth was first arrested outside of the courtroom "due to behavior that occurred outside, which [the] [c]ourt was not privy to" and then removed from the courtroom for continuously interrupting the judge.

interests hearing in order to determine Cody's placement and custody.[5] Beth's visitation remained suspended during this time.

Carl testified at the hearing that after Beth became pregnant, she started to get increasingly paranoid. According to Carl, her behavior continued to escalate, and she was constantly checking on him by texting and calling him. He described a domestic violence incident that led to both he and Beth obtaining restraining orders against each other and he explained that after Cody was born, Beth began acting "more and more out of control," which led him to believe that she did not possess the ability to raise their son. Carl also described the events of October 27, 2015, which led to the filing of the complaint by the Division.

Sostre also testified and stated that only DBT has proven effective at managing Borderline Personality Disorder. The doctor explained that DBT is difficult work because it involves a therapeutic, talking component but then also a written component. She also testified that many patients with personality

---

[5] In a Title Thirty action for care and custody, where there is no finding of abuse or neglect on the part of a parent, a summary hearing is required within six months of the order for care and supervision and then as extended by the judge if necessary. See N.J.S.A. 30:4C-12. At the end of the litigation, a dispositional determination is required to address the child's placement based upon his or her best interests. N.J. Div. of Youth & Family Servs. v. I.S., 214 N.J. 8, 36-37 (2013).

disorders are difficult to work with because those personality traits are ingrained.

A Division supervisor, Aracelis Cepeda, testified that after it was recommended to the Division that Beth engage in DBT, they reached out to her several times. Beth would either state she would get back to them or just hang up the phone. Cepeda also described the history of Cody's custody and Beth's visitation during the litigation, including her arrest for not turning Cody over at the end of the January 2015 supervised visitation that led to Beth's visits being temporarily suspended.

Dr. Marano testified at the hearing about her diagnosis of Beth as suffering from Borderline Personality Disorder, which if left untreated, would affect Beth's ability to parent her son. The doctor recommended DBT with a clinician who had expertise with that type of therapy. She also recommended that without further treatment, Beth not be reunified with Cody based on Beth's presentation and emotional reactivity demonstrated during her examination of Beth.

Wilfredo Martinez, a Division caseworker, also testified. He stated that the Division wanted Cody to remain in Carl's custody because there was stability and no issues with Cody living with Carl. He also described his attempts to schedule Beth for DBT, but he was unable to get in contact with her. Martinez

stated that when Beth did contact him about getting the names of therapists who could provide DBT, she responded that the providers he suggested were not able to provide the level of therapy that she required. He stated that although the Division had recommended three therapists for Beth's DBT treatment, he did not know whether they were actually able to provide the DBT because at the time, he had only just recently been in contact with them.

Beth's expert, Quintana, testified that Borderline Personality Disorder is often difficult to treat. He stated that it was no longer his recommendation that Beth be permitted to reunify with Cody because she had not engaged in any treatment for her Borderline Personality Disorder to develop greater insight into her behavior. The doctor also stated that although Sostre previously recommended Beth treat with a doctorate-level psychologist, a social worker, who was an expert in DBT would certainly be appropriate.

On the final day of the hearing, January 31, 2017, the trial judge found that the Division met its burden, by a preponderance of the evidence, that "the child require[d] care and supervision or custody of the Division. . . . [Beth was] unable to adequately care for the child based on the [c]ourt's finding of fact and conclusions of law, pursuant to [N.J.S.A.] 30:4C-12."

The judge entered an order continuing Cody in the Division's care, with legal custody remaining with both parents, and physical custody with Carl. The judge also ordered the Division to use reasonable efforts to find a therapy-provider who could provide DBT services. The Division was to refer Beth for DBT and her therapeutic visitation with Cody was made contingent upon her attendance and compliance with DBT. As to the best-interests hearing, the judge stated that her decision was "not a final disposition of the case, so . . . the hearing [was] reserved subject to anybody's ability . . . to reinstate it for a final determination as to the best interest of the child with regard to custody."

The parties agreed that the best-interests hearing should be deferred to give Beth a period to bond with her child through therapeutic visitation. Beth consented to the deferral of the "ultimate custody determination . . . until such time as she begins to accept and meaningful[ly] engage" in DBT. Beth also agreed that should another best-interests hearing be conducted in the future, the testimony and evidence adduced at this hearing could be incorporated and considered by the judge at that time.

On May 30, 2017, the judge conducted another summary hearing at which Martinez testified that the Division was unable to find a doctorate-level therapist to provide DBT. He explained that he spoke with Sostre, who stated that a

12

masters-level therapist would be qualified to provide the therapy. After the Division scheduled an appointment with this masters-level therapist, Beth failed to attend her intake on March 21, 2017, and for that reason, Beth was not provided therapeutic visitation. Beth testified that she spoke with someone at the Division's proposed DBT center and was told that no one there could provide DBT.

The judge concluded that it was clear Beth continued to have mental health issues and was still in need of the Division's services. The judge stated that a masters-level therapist would be acceptable, ordered the Division to provide the names of some possible clinicians, and stated therapeutic visitation would be revisited once Beth began DBT. Beth began her DBT therapy in June 2017.

On August 29, 2017, the trial judge held a compliance review hearing where she accepted the Division's recommendation that since Beth was engaged in DBT at the Family Center, she be referred to Preferred Behavioral Health (PBH) for therapeutic supervised visitation with Cody. Thereafter, Beth participated in three visits with Cody in October 2017, all of which were without incident and appropriate. During each session, Beth demonstrated patience, affection, and an ability to comfort Cody when needed.

The judge conducted another summary hearing on November 30, 2017. Beth stipulated that she had mental health issues and remained in need of services provided by the Division. Beth also consented to the court's continuing jurisdiction under Title Thirty.

On February 16, 2018, Dr. Marano conducted a psychological re-evaluation of Beth. She found that Beth was "taking steps to move forward in her readiness to be a more active participant in her son's life." Although the doctor stated that visitation could be extended, she conditioned that extension on Beth's continuing to progress in DBT, noting "if [Beth] is unable to maintain emotional stability, boundaries and coping the above recommendations will need to be adjusted."

At a summary hearing held on February 26, 2018, the judge stated she was inclined to dismiss the litigation and schedule a best-interests hearing to determine Cody's placement because Beth missed four out of seven DBT appointments within a two-month period. Beth stated that she only missed her scheduled DBT appointments because her car broke down and she had other similar problems. The judge also noted Beth's continued non-compliance with following instructions and her inappropriate behavior in dealing with the Division, which was also addressed at the hearing. However, the judge left the

14

matter open pending the best-interests hearing to determine Cody's custody because if she had dismissed the litigation, Beth would have been foreclosed from applying for a public defender to represent her at the best-interests hearing. The judge then denied the Division's request to have visitation suspended.

Dr. Sostre conducted an updated psychiatric evaluation of Beth on April 2, 2018. The doctor found that despite six months of psychotherapy, Beth was unable to determine why therapy was recommended, what issues the therapy was intended to address, and whether the therapy was helpful. The doctor recommended continued DBT therapy and supervised visitation.

At a compliance review hearing on April 25, 2018, the Division requested that the judge schedule a second dispositional best-interests hearing. The judge scheduled the hearing for August 2018.

Although Beth's visitation continued, Division caseworkers reported they were not without incident. On multiple occasions, Beth became enraged with caseworkers over issues about marks she found on Cody or how they took photographs of her and Cody. Beth expressed multiple times that the caseworkers were not taking care of Cody or not doing their jobs properly. PBH terminated its participation as the provider for visitations because of Beth's conduct, stating that her behavior was disruptive to other visits PBH was

A-2058-18T3

facilitating. The Division informed Beth that she could visit with Cody at one of their own offices. Thereafter, Beth had a confrontation with a security officer at the Division's office while being screened before entry for a scheduled visit.

On May 29, 2018, the trial judge conducted another Title Thirty summary hearing. Martinez testified and stated that there were no restraining orders in effect between Beth and Carl, although Beth and Carl each had restraining orders against each other before Cody was born. He stated that Beth still had supervised visitation with Cody, although her visits now took place at a local Division office as PBH no longer felt comfortable with the Division using their office for Beth's visits with Cody. Although Beth was still scheduled for DBT sessions, Martinez stated she was recently not attending. Martinez testified that, according to Beth's therapist, she was no longer a risk to Cody and recommended that visitation be extended.

The trial judge found that Cody was still required to be under the care and supervision of the Division because Beth had mental health issues as demonstrated by her behavior at PBH. She ordered Beth to continue with her DBT, visitation would occur at the Division's office, and that if Beth was uncooperative with Division staff during her visits, the Division could terminate the visit.

During June and July 2018, several mental health professionals issued additional reports. Vivian Shnaidman, M.D., conducted a psychiatric evaluation of Beth, on Beth's behalf, and opined that Beth had been "referred to the most incompetent psychologists and psychiatrists the Division [had] managed to find" and that there was "absolutely no reason why [Beth could not] parent her son."

Dr. Sostre issued an addendum report in which she stated that Beth's inability to recognize how others respond to her emotional instability continued to plateau. The doctor stated that Beth made little progress with her therapy and that it seemed as though she "continued to act on her own internal distortions."

Marano issued an addendum report after she reviewed Division contact sheets from between March 2018 and May 2018. Marano observed that her previous recommendations, set forth in her February 16, 2018 report, "noted the necessity to confirm continued progress" with Beth's treatment. The doctor stated that the recent information regarding Beth's behavior at visitation "highlight[ed] the challenges to [Beth's] diagnosis of Borderline Personality Disorder." She explained that Beth's "recent problematic behaviors prohibit[ed] current movement towards unsupervised visitation."

Joyce Mierzejwski, Beth's DBT clinician, also provided a report that stated Beth was now attending all her individual therapy sessions, and that Beth

was working on her emotional regulation and demonstrated insight into how her frustration can trigger an elevated mood. She reported that Beth was not a danger to Cody, that Beth could provide a safe and nurturing home for Cody, and that Beth and Cody should be reunited.

The judge held a second best-interests hearing over three days in August 2018. At the hearing, Martinez testified and reiterated much of his previous testimony, stating that the Division arranged for Beth to attend DBT at the Family Center with Mierzejwski after the first best-interests hearing in January 2017, but that Beth did not always attend her scheduled sessions. Martinez also testified that the Division arranged for therapeutic visitation at PBH after Beth began her DBT, but that visitation was then transferred to the Division office after Beth exhibited disruptive behaviors at PBH's office. Martinez also explained that he was never able to positively communicate with Beth for extended periods of time. He stated that when he spoke to her, Beth would get upset or stop engaging with him when she was questioned. Martinez also addressed Cody's status at Carl's home. He stated that based on his observations, it was a "very loving environment." He testified that he had no concerns with Cody living in his father's house.

A-2058-18T3

Joyce Curcio, a Division employee, testified that she supervised visitation for Beth and Cody during the months of April and May 2018 at PBH. She recalled an incident on May 8, 2018 during one of the supervised visits where Beth, instead of waiting in the visitation room for Cody to arrive, began accusing the Division workers of working against her. Ms. Curcio explained to Beth that she had to go back to the visitation room and wait for Cody to arrive as that was the agreed upon procedure. Beth was "very resistant to that idea," although she ultimately complied. Beth asked Ms. Curcio to take photographs of the marks on Cody's body, but Beth did not like the photographs. Beth accused Ms. Curcio of being unable to properly take photographs and left the visitation room to get a PBH staff member involved. Beth proceeded to ignore Curcio for the rest of the visit. Ms. Curcio testified that this behavior was disruptive for PBH because she did not know Carl's location, even though she knew Beth and Carl needed to be kept apart. Ms. Curcio testified that she followed Beth out of the visitation room when she went to involve PBH which made Beth "not happy."

Ms. Curcio also testified to another visit, on May 15, 2018, at PBH, where Beth showed up after Carl, his mother, and Cody, said "good morning" to them as she walked past, and walked into PBH. Ms. Curcio testified that although the visit itself went smoothly, she did not think it was secure anymore with only

19

PBH staff. Ms. Curcio also testified that PBH made a phone call to someone about issues they had with Beth at their facility, but she was not privy to that conversation.

Dr. Marano also testified on behalf of the Division and stated that she diagnosed Beth with Borderline Personality Disorder because Beth was very emotional during her interview and kept referring to how she was a victim of Carl, the Division, and her mother. Moreover, Beth presented as "very focused" on Carl and despite Dr. Marano's attempts to refocus her on a plan for the future, Beth continued to focus on her victimization. The doctor testified that treatment for Borderline Personality Disorder is long-term and intensive because the individual must recognize a pattern of behavior that continues to result in adverse consequences. Dr. Marano had recommended DBT and stated that although Beth had engaged in DBT therapy, Beth still had difficulty managing her emotions and her reactions, highlighted by those during recent visitations. She also explained that while Beth's direct interaction with Cody was acceptable, it was her reactions to external stimuli and individuals around her that led Marano to believe that Beth was unfit for unsupervised visitation.

Sostre also testified at the hearing and stated that she also diagnosed Beth with Borderline Personality Disorder given that Beth lacked any insight into

whether her behavior was problematic. She explained that after she reviewed the Division's contact sheets from March and May 2018, even though Beth was attending her DBT sessions, she noted Beth was still easily angered and began hyper-focusing on Cody's health. The doctor testified that the black and white thinking, characteristic of someone with Borderline Personality Disorder, was manifesting again despite Beth attending DBT. Sostre explained that she was concerned about Beth's lack of insight, and stated that Beth still had not made significant progress with her DBT, because of her angry outbursts as recent as May 2018. The doctor pointed out that she was never given Marano's updated report noting how Beth acknowledged her past behaviors, and that information would have been important in evaluating Beth's insight.

Schnaidman testified on Beth's behalf, stating that Beth was fit to parent her son. She thought that Beth suffered from a peripartum psychosis, but it was never properly documented. She testified that a psychiatrist was necessary to make that determination because peripartum psychosis is not something a social worker or a psychologist would recognize. When asked about whether she agreed with Sostre's evaluation of Beth, Schnaidman testified "I don't want to . . . bad mouth [Dr. Sostre], but . . . I have a history with [that] lady." She

A-2058-18T3

also testified that she did not think Sostre was a good psychiatrist and that she tells the Division what they want to hear.

Schnaidman also testified that Beth was doing well in her DBT sessions and should be monitored by a psychiatrist every six months. When questioned about what impact a highly emotional parent might have on a child, Schnaidman testified that many children grow up with highly emotional parents and the literature on the subject found that having emotional parents does not necessarily result in children being worse off.

Mierzejwski testified as a fact witness on Beth's behalf and stated that she began providing DBT to Beth in June 2017. Mierzejwski did not think Beth had Borderline Personality Disorder, but believed she had borderline personality traits. Mierzejwski testified that Beth made "a lot of progress" in her DBT, especially in identifying triggers for her emotions. She stated that she believed Beth developed an understanding of how her reactions can lead to frustrating situations. Mierzejwski also testified that while Beth should not be reunified with Cody at the time, she should be permitted to continue toward reunification. According to Mierzejwski, Beth had at least another six months of DBT to address traumatic situations.

At the conclusion of the hearing on August 29, 2018, the trial judge placed her decision and findings on the record. The judge found that it was not in Cody's best interest to be reunified with Beth based on the testimony of the Division's experts and Beth's DBT therapist. The judge ordered that the Division would still be responsible for Cody's care and supervision. Beth's parenting time was extended to twice per week for two hours each visit and the Division was required to make a referral for co-parenting counseling.

In reaching her conclusion, the judge did not find Schnaidman's testimony credible or helpful. The judge stated her testimony was "the most bias[ed] testimony that quite frankly this [c]ourt has heard in a very long time." She also found that none of the Division's expert witnesses were biased against Beth, as there were contact sheets from the Division upon which the doctors opined. Further, there was "no question that [Beth] at times exhibited behaviors that were not appropriate," as set forth in the contact sheets from the Division.

The judge concluded by finding that it was not in anyone's best interest to continue this litigation under Title Thirty. The judge directed that the matter would be held open for the limited purpose of allowing Beth time to get on a waiting list for the court's supervised visitation program, as the Division could no longer supervise visits.

A-2058-18T3

At a later hearing held on December 4, 2018, the Division formally requested dismissal of the action as Cody was safe in Carl's residential custody. The judge could not find a reason to leave the matter open, stating Cody was safe with Carl and the Division had no concerns regarding Cody's environment living in Carl's home. The judge entered an order terminating the litigation, allowing Beth to continue individual counseling through her own insurance, permitting Beth to have supervised visitation with the selection of a supervisor and the exchange of the child to be addressed under a separate action filed under Docket No. FD-15-1142-16, and ordering that the Division no longer had an obligation to provide supervised visitation. This appeal followed.

II.

Our review of a Family Part judge's determination in custody and parenting-time matters is limited. "Family Part judges are frequently called upon to make difficult and sensitive decisions regarding the safety and well-being of children." Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007). "[B]ecause of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "[W]e have 'invest[ed] the family court with

24                                                                    A-2058-18T3

broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children.'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 365 (2017) (second alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012)). "[W]e defer to [F]amily [P]art judges 'unless they are so wide of the mark that our intervention is required to avert an injustice.'" Ibid. (quoting F.M., 211 N.J. at 427).

Where a Family Part judge relies upon evidence adduced at a hearing, "[w]e ordinarily defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)); see also N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 143 (App. Div. 2016). We accord substantial deference to the factual findings of the Family Part when they are supported by "adequate, substantial, and credible evidence" in the record. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). We will sustain "the trial judge's findings unless it is determined that they went so wide of the mark that the judge

was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007).

However, "[w]e owe no special deference to the trial judge's legal determinations." Slawinski v. Nicholas, 448 N.J. Super. 25, 32 (App. Div. 2016). "Notwithstanding our general deference to Family Part decisions, we are compelled to reverse when the court does not apply the governing legal standards." Ibid. (citation omitted).

III.

A.

Turning to Beth's challenges on appeal, all of them are focused only on the trial judge's dispositional determination as to Cody's placement and her visitation at the end of a Title Thirty action. Unlike a Title Nine action,[6] which involves allegations of abuse or neglect, the Division in a Title Thirty[7] action for care and supervision is authorized to intervene when "a child who, although not abused or neglected, [may be] in need of services to ensure [his or her] health and safety." N.J. Div. of Youth & Family Servs. v. T.S., 426 N.J. Super. 54, 64

---

[6] Title Nine, N.J.S.A. 9:6-8.21 to -8.73, is designed to protect children who suffer serious injury inflicted by non-accidental means. G.S. v. Dep't of Human Servs., 157 N.J. 161, 171 (1999) (citing N.J.S.A. 9:6-8.8).

[7] N.J.S.A. 30:4C-11 to -24.

(App. Div. 2012). The Division may seek a "court order to intervene and require a [parent or guardian] to undergo treatment, or seek other relief, if the best interests of the child so require." N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 9 (2013) (citing N.J.S.A. 30:4C-12). Once a judge determines the Division's supervision or care is no longer needed, the judge should dismiss the matter. T.S., 426 N.J. Super. at 66.

Although N.J.S.A. 30:4C-12 does not mandate a dispositional hearing, our Supreme Court has held that Title Thirty proceedings require a dispositional conclusion. See I.S., 214 N.J. at 14. The purpose of this dispositional conclusion "is to determine whether a child who has been in the care, supervision, and custody of the Division 'may be safely returned to the custody of the parent from whom the child was removed.'" N.J. Div. of Youth & Family Servs. v. I.S., 422 N.J. Super. 52, 70 (App. Div.) (quoting N.J. Div. of Youth & Family Servs. v. N.D., 417 N.J. Super. 96, 107 (App. Div. 2010)), opinion clarified on denial of reconsideration, 423 N.J. Super. 124 (App. Div. 2011), aff'd in part, rev'd in part sub nom., N.J. Div. of Youth & Family Servs. v. L.S., 214 N.J. 8 (2013).

The standard for the dispositional hearing is the best interests of the child under N.J.S.A. 9:2-4,[8] unless the Title Thirty action involves an out-of-home placement of the child and a dispute that does not involve two parents. See I.S., 214 N.J. at 40. The statute "is commonly used in a variety of family matters before a court when making an initial custody determination or a change in custody is requested." Ibid. As a result, a parent seeking the return of his or her child bears the burden to prove a change in circumstances warranting the child's return to that parent's custody. Id. at 39-41; see also N.J. Div. of Youth & Family

---

[8] The factors for the best-interests analysis are:

> [T]he parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.

Servs. v. G.M., 198 N.J. 382, 387-88, 402 (2009) (addressing a dispositional hearing held at the end of a Title Nine action to determine whether the child "may safely be released to the custody of [the offending parent], who was responsible for [his or her] care at the time of the filing of the complaint, or whether, consistent with N.J.S.A. 9:6-8.51, some other disposition is appropriate").

"When a court determines that a child may not be safely returned to the parent from whom the child has been removed, the court may proceed with a guardianship action and termination of parental rights." I.S., 422 N.J. Super. at 70 (citing N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 121-22 (2011)). "An exception to initiating such an action exists when 'the child's needs for stability and attachment' are met by the non-custodial parent or other relative." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 609 (1986)).

"[A] noncustodial parent who obtains full-time care of a child after the initiation of child-protection proceedings 'may always initiate a request for a change in custody,' which involves a changed-circumstances inquiry and, ultimately, becomes a best-interests analysis." I.S., 214 N.J. at 40 (quoting G.M., 198 N.J. at 402 n.3). The parent to whom custody was temporarily

transferred during the child-protection litigation has the burden of proving placement with them under the best-interests standard. See id. at 40-41. Even if this process is not followed "precisely," placement with the parent to whom custody was temporarily assigned is suitable when that parent is "the only appropriate parent to award custody . . . at the dispositional conclusion of [the] . . . Title [Thirty] proceeding." Id. at 41.

In Beth's first argument on appeal, she contends that the trial judge failed to make any findings of fact that it was not safe to reunify Beth and Cody and that their reunification was not in his best interests. Specifically, she argues that the trial judge failed to perform a best-interests analysis to determine whether it was safe to return the child to her, as she was the parent from whom Cody was removed, and the evidence did not support the judge's decision. We disagree.

At the conclusion of the August 29, 2018 and December 4, 2018 hearings that led to the dismissal of the action and placement of Cody with Carl, the judge issued oral decisions setting forth her reasons. Although the judge's decision did not contain the most "explicit findings and clear statements of reasoning," Gnall v. Gnall, 222 N.J. 414, 428 (2015), we are satisfied that they met the requirements of Rule 1:7-4. See R. 1:7-4 (stating that a trial judge "shall, by an

opinion or memorandum decision, either written or oral, find the facts and state [his or her] conclusions of law thereon in all actions tried without a jury").

In her decision, the trial judge made specific credibility findings. She also expressed her reasons for finding that continuing to provide services to Beth did not have any prospects of success, which warranted the termination of the action. In doing so, she cited to the evidence in the Division's records and its representatives' testimony about the difficulties in securing Beth's cooperation, her attendance at the required therapy, and her inability to control herself at visitations. The judge also relied upon the experts' testimony, even Beth's expert, that it was not yet safe to return Cody to Beth even though she had finally received and attended DBT. The judge's findings were well supported by the record. "[I]t would require blinders for this [c]ourt not to recognize that granting custody to [Carl] was an appropriate disposition to end the Title [Thirty] proceedings. In our view, the [trial judge's] ultimate action was the only one that could have been judicially imposed." I.S., 214 N.J. at 41.

B.

Next, Beth argues that the record did not support the trial judge's conclusion that her visitation needed continued supervision and that the

dismissal of the Title Thirty litigation was warranted. We find no merit to this contention.

We conclude the trial judge properly terminated the Title Thirty litigation. Title Thirty's "multiple step process . . . demonstrates a funneling by the Legislature, establishing limits that prevent the Division from becoming a roving commission to inquire into families' personal lives." Id. at 35. The trial judge has discretion in determining whether to extend the Title Thirty litigation if he or she is satisfied, based on a preponderance of the evidence, that the best interests of the child require extension. See id. at 37-38. "Absent a showing that services or supervision or both appear to be in the best interests of the child because the services are needed to ensure the child's health and safety, a case [under N.J.S.A. 30:4C-12] should be dismissed." T.S., 426 N.J. Super. at 66. "Parents do not have the right to extend litigation indefinitely until they are able to safely care for their children . . . ." N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 524 (App. Div. 2018).

Here, there was no evidence that maintaining the action, which was ongoing for approximately three years, was in Cody's best interest. Although, as the judge found, Beth was making progress in DBT, the evidence established that she was still prone to acts of aggression and outbursts toward third parties

that, she thought, interfered with her ability to safely parent her child. For that reason, Cody's best interests required that Beth's visits remain supervised.[9] As to Carl, the judge found that based on the witnesses' testimony, it was unsafe to place Cody with Beth, and Cody was safe and well cared for in his father's custody. Under these circumstances, there was no reason to either continue the litigation or remove Cody from Carl's care.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] After filing her appeal, Beth filed a motion for visitation with Cody pending appeal and to have it supervised by her brother and his fiancé. We remanded the matter to the trial judge. On July 18, 2019, the trial judge entered an order granting Beth supervised visitation through the court's visitation program and four-hour visits every other weekend to be supervised by her brother or another identified individual.

A-2058-18T3