# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3702-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

N.S.,

      Defendant-Appellant/
      Cross-Respondent,

and

K.S.,

      Defendant.

_____

IN THE MATTER OF S.S.,
H.S. and C.S., minors,

      Respondents/Cross-Appellants.

_____

Submitted September 21, 2020 – Decided October 28, 2020

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0235-16.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent, N.S. (Robyn Veasey, Deputy Public Defender, of counsel; Andrew R. Burroughs, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors/cross-appellants (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this Title Thirty action for care and supervision filed under N.J.S.A. 30:4C-12 by plaintiff, the Division of Child Protection and Permanency (Division), the mother of three children, defendant N.S. (Nina),[1] appeals from the Family Part's March 21, 2019 order terminating the action and granting the children's father, defendant K.S. (Kyle), continued sole custody of their children. The Division filed

---

[1] To protect privacy interests and for ease of reading, this court uses initials and pseudonyms for the parties and the children. R. 1:38-3(d)(12).

the action due to concerns over the children's safety and health, arising from Nina having been diagnosed with factitious disorder imposed on another (FDIA).[2]  On appeal, Nina argues that the trial judge erred because he relied on the Division's unqualified expert who rendered a flawed diagnosis.  The Law Guardian also appealed and argues that the children should be reunited with Nina as any problems they had were significantly resolved prior to Kyle receiving custody of the children. We affirm as we find no merit to these contentions, substantially for the reasons

---

[2]  As we have previously explained,

> [w]hat [was] usually referred to as "Munchausen Syndrome by Proxy," [and now] more recently, [FDIA] is a mental illness by which a person caring for another, often a child — in seeking attention — acts as if the cared-for individual has a physical or mental illness.  Its effect on the cared-for individual results from the obstacles it creates for health care providers striving to identify the cared-for individual's nonexistent illness, thereby making the matter worse.
>
> [N.J. Dep't of Children & Families v. L.O., 460 N.J. Super. 1, 4 n.1 (App. Div. 2019).]

FDIA is found "when someone falsely claims that another person has physical or psychological signs or symptoms of illness, or causes injury or disease in another person with the intention of deceiving others." Factitious Disorder, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/factitious-disorder/symptoms-causes/syc-20356028 (last visited Oct. 15, 2020).

3

expressed by Judge Terence P. Flynn in his comprehensive and thorough sixty-page oral decision that he placed on the record prior to entering the order under appeal.

I.

A.

Defendants were married in January 2003 and they had three children: H.S. (Haley), who was born in 2005, C.S. (Carrie), born in 2006, and S.S. (Sarah), born in 2009. In December 2010, Nina's and Kyle's relationship deteriorated causing them to separate, with Nina and the children moving to New Jersey and Kyle staying in Pennsylvania where the family had been living together. After the separation, Kyle filed for divorce in Pennsylvania, which was granted in 2014. In October 2012, after a custody hearing was held, a Pennsylvania judge entered an order granting the parties shared legal custody of the children, with Nina having residential custody, and Kyle having parenting time every other weekend in Pennsylvania.

In 2012, the Division became involved with the family as a result of two referrals that Nina made against Kyle alleging lack of supervision, which were later determined to be unfounded. In 2015, Kyle made a referral and alleged that Nina subjected Haley to "emotional abuse and endanger[ed her] welfare" arising from the medical treatment to which Nina was exposing the child and from Haley's failure to attend school on a regular basis. Thereafter, additional referrals were made by

Haley's school due to the children's excessive absences, and by Haley's medical providers regarding Nina's failure to secure recommend treatment for Haley.

Haley's medical issues began in 2013 and continued through approximately 2017. During that time, Nina took Haley to hospitals numerous times for complaints about severe stomach pains. Haley visited the emergency room of various hospitals at least fourteen times and was admitted to the hospital for several days on at least two occasions. Moreover, she was seen by several doctors at least forty times during the same period. Typically, Nina would bring the child to the hospital or doctor and advise that Haley was repeatedly vomiting or experiencing severe bouts of diarrhea accompanied by severe pain, but the medical providers seldom if ever found symptoms consistent with those complaints.

Although Haley was eventually diagnosed with celiac disease and gastroparesis, doctors concluded that she also suffered from functional abdominal pain. To address the abdominal pain, doctors recommended alterations to her diet, medication, out of home counseling, and a return to normal activities such as attending school regularly. Nina disagreed with the diagnosis and recommendations and refused to have Haley participate in out of home counseling, even when that treatment was later ordered by the judge in this action. According to Nina, Haley was too sick to travel out of the home to receive the behavioral therapy

recommended by the doctors or the cognitive behavioral therapy later ordered by the judge.

Notably, Haley's pain did not prevent her from travelling or otherwise participating in non-school events.  According to school officials, Haley attended a summer program within the district without any incidents or issues related to her health.  That program included participating in bus trips to New York City.

By June 2015, a medical provider from Children's Hospital of Philadelphia (CHOP) raised concerns with the Division about Nina demonstrating signs of FDIA because Haley's symptoms were inconsistent with her diagnosis, Nina refused to get Haley outpatient counseling, and Nina was "medically noncompliant."  The reporter stated that the treating doctors at CHOP felt strongly about Haley being able to get out of the house, going to school, and seeing a therapist.  Before the Division interviewed Nina, she contacted the CHOP employee who made the referral and requested the employee contact the Division and inform them that the referral was based on a false accusation.  The employee did not comply.

During the Division's ensuing interview, Nina stated that she did not believe CHOP was providing Haley with the treatment she needed, she made excuses for not following CHOP's recommendations, and she planned on getting another opinion about Haley's medical conditions.  The Division also interviewed the children, who

6

stated that they felt safe with Nina. Haley also explained that she rarely saw Kyle, that she was not feeling well, and that she wanted to go to school but her health prevented her from going. The Division's caseworker observed that Haley was "free from any visible signs of abuse or neglect at the time."

The Division also spoke with a nurse practitioner and treating doctors who also shared the reporter's concerns. Not only did the nurse practitioner never see Haley vomit, but she also stated that Nina exaggerated Haley's symptoms and refused to follow CHOP's recommendations. The doctors stated that Haley and the family needed intensive outpatient counseling. On the other hand, a therapist, who was a licensed clinical social worker and who was seeing Haley at home, believed that at-home counseling was most beneficial for Haley.

During interviews with the principal at Haley's school, he stated that when Haley was in school, she appeared fine and it was his belief that Nina "was encouraging [Haley] to be at the house," however, other than that he was not concerned about the safety or health of the children. However, in February 2016, the principal contacted the Division with concerns about both Haley's and Carrie's absences at school. According to the principal, Haley had already missed twenty days of school, and Carrie missed thirty-five days that year. While Nina informed the principal that both children were missing school for the same medical reasons,

the principal was not given doctor's notes to support all the absences. The Division concluded that the children were not educationally neglected, but there was sufficient evidence to demonstrate that the children were at risk of harm.

That month, the Division received notes from a treating doctor, who stated that Carrie was now also diagnosed with "functional abdominal pain" and she had a body mass index of less than one percent. The doctor prescribed Mirtazapine, an antidepressant for Haley and Carrie. The doctor's notes indicated that while Haley and Nina reported that Haley was "persistent[ly] vomiting for weeks[, the tests indicated] there [were] no lab abnormalities consistent with dehydration." Haley was eating "normal amounts of food" and the "differential diagnosis for this situation include[d] symptom[s of] exaggeration, extreme parental anxiety, [FDIA, and] rumination syndrome." According to the doctor, "patients with functional abdominal pain should be in school as much as possible . . . as this [could] decrease symptoms and maintain normal functioning." In response to the doctor's notes and referral, a Division caseworker attempted to visit the children's home, but Nina refused to allow the caseworker to interview the children; instead, Nina spoke with the caseworker and claimed that her children were sick, which made it difficult for them to go to school and to function normally.

B.

Due to Nina's continued failure to follow medical provider's recommendations and the Division's concerns about Haley's and Carrie's safety, the Division filed a Title Thirty action on March 9, 2016, seeking the care and supervision of the three children. The Division also obtained a court order requiring Nina to undergo a psychological evaluation and allow the children to be interviewed.

A Division caseworker interviewed Haley and Carrie at their school. Carrie admitted to having severe stomach pains, but she could not recall the last time she had such pains. She also stated that she rather be at school than at home. On the other hand, Haley did not want to be in school, and claimed that her stomach constantly hurt her because of her gastroparesis and stress build up. The interview ended early when Haley became visibly upset.

Nina was interviewed again, and she denied ever suggesting Haley be placed on a feeding tube. She further believed that Haley's current in-home therapist could effectively provide Haley with the care she needed. The Division worker attempted to speak to Haley and Carrie again, but the girls claimed they were too sick.

The Division caseworker met with Haley's therapist, who had no concerns about Nina's care for the children but was concerned about Kyle's ability to care for

9

the children. The therapist also stated she witnessed Haley in severe pain. She further noted that Haley got car sick, so outpatient therapy would not be possible.

The Division presented its findings to the trial judge at hearings that took place on March 24, 2016 and June 13, 2016. After considering the testimony presented, the judge determined that the allegations about Nina's FDIA impacting Haley's health also raised concerns about Carrie's health, and that Haley needed outpatient counseling. The judge rejected Nina's contention that Haley could not travel to get outpatient counseling and found that her therapist was not reliable as she did not even address the reports of Nina's FDIA. The judge granted the Division continued care and supervision of the children.

Thereafter, the children's doctor prescribed a specific medication regime for Haley to help with her nausea and some improvements in Haley's health were noted. The doctor indicated her concern that the alleged symptoms Haley was experiencing were not witnessed by her medical staff.

In September 2016, Nina transferred Haley's treatment to Dr. Marcos Alfie, at Jersey Shore University Medical Center (JSUMC). Dr. Alfie reduced Haley's medication. Later, while Haley was doing better, Nina brought her to the emergency room once more.

Nina also transferred the children to a private parochial school for the 2016 to 2017 year because the school had a fulltime nurse. At the new school, during the first year, Haley missed twenty-three days and arrived late on seventeen days, and Carrie missed twelve days and was late on twenty days.

On October 3, 2016, the judge ordered that Nina and Kyle undergo psychological evaluations by Janet Cahill, Ph.D. The judge also ordered that Haley have cognitive behavioral therapy. Hayley was permitted to continue to meet with her in-home counselor as well.

On November 7, 2016, Dr. Cahill conducted a parental capacity evaluation of Kyle. She found Kyle to be pleasant, cooperative, rational, and that he had good insight.

Although Dr. Cahill was to also evaluate Kyle with the children, Carrie was unable to attend the evaluation as, according to Nina, she did not feel well and vomited that day. Based on her observations of Kyle and the other children, Dr. Cahill found that Kyle was responsive and warm towards Haley and Sarah, and neither child had any concerns with their father. Dr. Cahill did not identify any parenting risk factors and concluded Kyle could effectively care for the children.

During the evaluation, and without any prompting, Haley informed Dr. Cahill that her former physician "had made a mistake when she wrote down [FDIA] on her

report," and Haley stated she knew what the report said, as Nina informed her about it. The doctor reported that evidence suggested Nina had a "possible diagnosis of FDIA."

While the children were being evaluated, Nina had contacted the police because she was concerned about her children's safety. When Nina was notified that her children and Kyle were with Dr. Cahill, Nina called Dr. Cahill, and complained about the evaluation. She also texted the children during the evaluation and called the police again. According to Dr. Cahill, because of Nina's "attempts to sabotage the evaluation, the usual observation protocol could not be completed," as Nina "was directly coaching" Haley on what to say.

On December 8, 2016, the trial judge again ordered that Haley undergo cognitive behavioral therapy. All three children were ordered to attend outpatient counseling outside the home. Nina was also ordered to undergo a psychological evaluation by Dr. Cahill.

Eventually, Dr. Cahill was able to conduct an evaluation of Nina on February 28, 2017, after she failed to attend her first two appointments. Dr. Cahill found Nina to be "superficially cooperative and cordial," "facile and deceptive," and that her statements were inconsistent with other sources. Dr. Cahill decided not to conduct a separate observation of Nina with the children because of her "brazen coaching of

the children during [Kyle's] evaluation." Dr. Cahill concluded that there was sufficient evidence demonstrating a possible diagnosis of FDIA, and she suggested that as a test, the children be separated from Nina for a time to determine whether the children were actually exhibiting the symptoms Nina alleged.

On May 31, 2017, the trial judge again ordered that Haley have cognitive behavioral therapy and that the children attend outpatient counseling outside the home. Nina failed again to comply with the judge's order.

Thereafter, the Division brought to Judge Flynn's attention Nina's continued failure to abide by its recommendations and the judge's orders. On July 7, 2017, after considering testimony from Dr. Cahill, and from Nina's expert, Dr. Andrew Brown, a licensed clinical psychologist who specialized in neuropsychology but not FDIA, the judge ordered a separation test and for that purpose granted Kyle sole legal and physical custody of the children. The separation test was to occur over at least an eight-week period, during which Nina was not to have any contact with the children.

After the children were placed with Kyle, the Division visited his home and had no concerns about the safety and care of the children under his control. Kyle reported that Haley was doing better, she did not get sick, and ate all her meals, however, he was concerned that she overate. While the Division worker noted that

Haley did not complain of any abdominal pain, she continuously requested to see Nina and her maternal relatives.

On August 15, 2017, six weeks into the separation test, Dr. Cahill wrote to the Division, informing it that since the children were removed from Nina's care, the children were doing well. There was no evidence of any health issues, and overall, the "pattern of illness reported by [Nina was] not occurring." She concluded that these findings "support[ed] the full diagnosis of FDIA," and she made the following recommendations: the children not be returned to Nina; Kyle should be granted full custody; Nina should not have any contact with the children until she has improved with therapy that specifically dealt with FDIA, which should provide insight and help Nina see how "her parenting of the children was abusive and not in their best interest." On August 21, 2017, the judge ordered Nina meet with a therapist qualified to treat FDIA and notify counsel of the therapist chosen. Kyle was ordered to ensure the children receive therapy as well.

By September 22, 2017, Haley was completely off her medication, Dr. Alfie noted that she was doing well, and Haley only had one flareup. Carrie and Sarah received outpatient counseling for a short period of time, while Haley's visits with the therapist continued. At their new school in Pennsylvania, Haley and Carrie only had one absence and they were late only three times.

While the children were in Kyle's custody, from December 2017 to April 2018, Nina was to exercise her parenting time twice monthly, once in Pennsylvania and once in New Jersey under the supervision of the Division. During visits, Division workers had to redirect Nina, as she advised the children to disregard the Division's recommendations. Two visits had to end early as the Division workers felt uncomfortable because Nina was being difficult, causing a scene, and recording the Division workers when they asked her to stop.

When Nina's behavior during visits was brought to the judge's attention, he ordered therapeutic supervised visits at Grace Abounds Counseling (GAC). During visits there, Nina was appropriate, engaged, and patient, with minimal redirection, but she did display "impaired insight about her maladaptive behaviors" and "limited adherence to boundaries." During one specific visit, Nina was "defensive and guarded" when redirected and violated protocol.

In October 2018, Dr. Cahill conducted a follow up evaluation to determine whether Nina had benefited from services. During the interview, Nina stated that she was seeing a psychologist of her own choosing, who disagreed with Dr. Cahill's recommendations and diagnosed her with an anxiety disorder. When Dr. Cahill attempted to contact that psychologist, with Nina's permission, he never returned her phone calls.

During the evaluation, Nina expressed that she did not understand why the Division was still involved and continued to deny having FDIA. When asked what she would do differently in caring for her children, she replied she "would have the doctors do more for them." Dr. Cahill concluded Nina made no progress and had no insight on how her behavior negatively impacted her children. She recommended Kyle have continued custody of the children and that any visitation with Nina cease.

The Division also had Dr. Gladibel Medina review and summarize all of Haley's medical records. Her review indicated that since 2013, Haley had fourteen emergency room visits and six hospitalizations. The doctor also explained all the diagnoses Haley had during that time. Dr. Medina stated that while Haley's symptoms were reported by Haley or Nina to be moderate to severe in pain, the observations by the doctors and medical staff demonstrated that the symptoms were not as severe, her symptoms could be due to anxiety, and she was in good spirits, and did not have difficulty eating.

## C.

The trial judge conducted a best interests hearing over eleven non-consecutive days beginning in November 2018 and ending on February 28, 2019. In addition to the parties and in-camera interviews of the children, thirteen witnesses testified. Dr. Cahill was the only expert witness.

During the children's interviews, Haley stated that she was doing well in school, had a good group of friends, and that she was hurt by her parents' divorce. Haley further stated that she had a good relationship with both her parents, but her relationship with Kyle suffered after she got sick, she wanted to live with Nina, and she was able to relate to each parent on different topics. According to Haley, nothing helped her stomach issues until she was prescribed Mirtazapine. Haley did not understand why the matter was prolonged for so long.

Carrie also stated that she wished to spend more time with Nina. While Carrie heard or was told her sister vomited, she never actually saw Haley get sick. According to Carrie, the only medical condition she ever had was asthma. Neither Carrie nor Sarah were concerned with how Kyle cared for them.

Kyle testified that Nina had made it difficult for him to see his children. As to Haley, Kyle stated that he only found out she had health issues in October 2013 when she was diagnosed with celiac disease. Around that time, Nina informed Kyle that Haley was continuously vomiting and had stomach issues, however, when Kyle visited Haley the first two times at the hospital, she "was perfectly fine." Kyle stated that he was never consulted about Haley's health, played no role in her medical decisions, that he "vehemently opposed" Nina's decision to move Haley from CHOP, and was not consulted about the girls going to a new school. While Haley

17

complained of her stomach hurting on two occasions, Kyle never saw her vomit and the pains quickly subsided.

Kyle also addressed his referral to the Division and stated he was concerned about Haley's many absences from school and Nina not following doctors' orders. He explained that based on his discussions with Haley's doctors she needed to be in school as there was "absolutely no issues with her health."

During the time the children moved in with him in 2017, Haley only vomited once and overall "[s]he was wonderful." Kyle denied that Haley was getting better because of Nina's actions prior to when he received custody, but instead, he asserted that Haley's health improved only when the Division got involved. Even though Haley wanted to live with Nina, Kyle believed he should have custody and that Haley needed intensive counseling to understand and deal with what Nina put her through. Kyle confirmed that by the time he received custody of the children, Dr. Alfie took Haley off medication. He also acknowledged that the children wanted to see Nina more.

The Division called as additional witnesses Kyle's sister, the Division's case workers, the children's former principal, and the licensed therapist from GAC. They testified that they never or rarely saw Haley sick or vomiting, that Nina was hard to deal with, she failed to follow the Division's recommendations, the caseworkers

were uncomfortable working with Nina, and that Haley's symptoms and general unhappiness were noticeable only when she was with Nina or had contact with her.

The school principal explained the basis for his referral was that the medical reasons Nina used to explain Haley's absences were also used for Carrie, who only had asthma. Further, Haley missed many days during the school year but had no problems with attendance at summer camp or trips to New York City for camp.

A GAC therapist explained that during visits, Nina impermissibly spoke about court proceedings and coming home to her with the children, and that Nina focused her attention and her manipulation primarily on Haley. In addition, a Division employee testified that Nina asked her to make changes to her report, but the employee was uncomfortable making the change as Nina's request was inconsistent with what the employee observed during a visit.

When Dr. Cahill testified, she explained her education and training as a clinical psychologist, her expertise in best practice assessments and treatment for children and in FDIA and described her involvement as a lecturer on that topic. Dr. Cahill dealt specifically with FDIA in at least thirty different cases, where she found that individuals either had or did not have FDIA. She also explained that she had been previously qualified as an expert in FDIA and testified as such in about ten

different cases. Although there was an initial challenge to her qualifications, after voir dire, no one objected to the trial judge accepting her as an expert in FDIA.

When Dr. Cahill testified about FDIA generally, she stated that based on the DSM-V, a diagnosis for an underlying medical condition would not negate or preclude a finding of FDIA as well. Further, not all of the patient's treatments needed to be unnecessary for a diagnosis of FDIA.

Dr. Cahill recounted her evaluations of Kyle and Nina as earlier described. She had no concerns with Kyle's ability to care for the children. But she found Nina to be "hostile and agitated."

Dr. Cahill specifically recalled looking at Haley's phone during Kyle's evaluation and seeing instructions to Haley from Nina attempting to get her back to Nina. It was clear to Dr. Cahill that Nina's coaching of Haley made Haley "absolutely distraught."

Anytime Dr. Cahill attempted to discuss FDIA with her, Nina would deny she had FDIA and continuously state that all the medical procedures, appointments, and emergency visits Haley went through were necessary. To Dr. Cahill, it was clear that Nina only liked those doctors who agreed with her and disregarded others, and that Nina was "very, very angry" with the children's school for being concerned about Haley's attendance. Dr. Cahill also testified about her second evaluation, in

which she concluded Nina showed no improvement or understanding of how her behavior negatively impacted the children. She also explained that the Division's records were consistent with the FDIA diagnosis.

Based on her own observation, and the medical records from numerous doctors, Dr. Cahill found there to be enough of a pattern of inconsistency for a diagnosis of FDIA. She recommended the removal of all three children, as there was "credible evidence that if one child [was] removed, the unnecessary treatment moves to another child." She further stated that the prognosis of FDIA is very poor, if not "the most poor prognoses . . . in child protection services."

Dr. Cahill also stated it was common for children of parents with FDIA to purposely take on the sick role and are "choosey about when they exhibit those symptoms," which was consistent with Haley not showing those symptoms when she was at camp, with her friends, or attending extracurricular activities. According to Dr. Cahill, if the children were returned to Nina, one would expect to "see recidivism." On cross-examination, Dr. Cahill indicated that the children only became distressed when Nina texted Haley during Kyle's evaluation. She further stated that she never asked Haley whether her mother was exaggerating her symptoms. Dr. Cahill stated her opinion did not change, even though others saw

21

Haley sick and continuously vomiting as it was normal in an FDIA diagnosis but also not important.

During Dr. Cahill's testimony, it was disclosed that she was not provided with all the medical documentation. After defense counsel had the opportunity to prepare questions regarding the documents Dr. Cahill was not given, the doctor indicated that she did not review "every single medical record." She further stated that if the summary by Dr. Medina was incorrect, it would affect her report. However, she stated that if she did not have all the medical records, that would not necessarily change her opinion as it was not a requirement to read all the medical information before making a diagnosis. After she was shown a summary from one provider demonstrating that a doctor noticed Haley did vomit and had streaks of blood, Dr. Cahill remained unconcerned, as the issue here was that Nina exaggerated Haley's symptoms, not that they were fabricated.

As to Dr. Alfie taking Haley off her medication because that "could be responsible for her worsening dysmotility condition," Dr. Cahill thought that was something she should consider, but also stated that it could be part of FDIA as she needed to question how exactly Haley was even placed on the medication. She further admitted it was wrong for her to state that Nina suggested Haley be placed on a feeding tube.

During Dr. Medina's testimony, she explained that functional abdominal pain, "is just pain, not necessarily caused by an organic." She said, "there might be other causes, psychological causes, or just feelings that might create discomfort, distress." While Dr. Medina first testified that none of the hospital records supported a finding that Haley vomited, she later acknowledged records from CHOP that she failed to review which stated that Haley did vomit and appear sick on occasions. While reviewing other CHOP records on the stand, she admitted that some records did indicate Haley was severely dehydrated and that she had anxiety which could have "trigger[ed her] abdominal pain."

When Nina testified, she recounted that when Haley first started having abdominal pain, she assumed it was just a stomach virus. But the pain got worse, Haley had to leave school frequently, and she was diagnosed with celiac disease. Nina described Haley's treatment at CHOP and later at JSUMC with Dr. Alfie, who lowered Haley's medicine's dosage. Anytime Haley was hospitalized, Nina stated that was always based upon recommendations from her doctors at CHOP, not at her own insistence. According to Nina, Dr. Alfie's changes and being prescribed Mirtazapine led to Haley's improvements. Nina denied ever exaggerating Haley's medical issues and stated that she was following the Division's recommendations.

According to Nina, she was almost always present when doctors were examining and treating Haley, but there were several occasions where she was asked to leave the room. Nina also denied being aware that CHOP recommended outpatient counseling for Haley, and claimed she only heard that recommendation from the Division. In any event, she believed that outpatient counseling would be too difficult with Haley's health.

Nina did not recall the Pennsylvania visitation order that required the visits with Kyle to take place in Pennsylvania, and even if that was a requirement, because of Haley's health, visits in Pennsylvania were impossible. Nina did not take the other children to visit Kyle when Haley could not go, as it would be unfair to Haley and claimed he should have come to pick the girls up in New Jersey. As to her own need for therapy, Nina indicated that she purposely did not follow the Division's recommendations at first but stated that she currently was seeing the Division's recommended therapist, however, she never informed the Division.

Several witnesses testified on behalf of Nina and stated that they had seen Haley sick and vomiting, including Haley's original therapist, Nina's significant other, Haley's maternal grandparents and other family members. They never saw Nina act inappropriately towards Haley. They also testified Haley's health was

improving when she changed her diet and was being treated by Dr. Alfie, which occurred months prior to Kyle getting full custody of the children.

D.

On March 21, 2019, Judge Flynn placed his detailed decision on the record. He noted that "the central issue . . . [was] whether . . . [Nina's] behavior . . . placed the children at risk with regard to their health and safety."

In reviewing the medical records, Judge Flynn stated that while Haley was anxious and had mild distress, "none of the symptoms that have been described by [Nina] and endorsed by Haley on their initial presentation in the hospital" were present. Further, while it was continuously claimed that Haley was "vomiting for days on end," she was always well hydrated, and any abdominal pain she had always reduced.

The judge found Nina's report of Haley's symptoms to be inconsistent with the hospital's findings. While Haley "was found to be consistent [with] having [c]eliac [d]isease and gastroparesis," lab results and the hospital's findings did not show any dehydration, which normally would show if one had been continuously vomiting. He found that Haley tended to act up and complain only in the presence of doctors or other hospital staff.

A-3702-18T1

Judge Flynn further stated that after Haley started being treated by CHOP, Haley's weight significantly fluctuated as well as Carrie's. He could only conclude "that the diet and the regimen that was being followed in the household was . . . completely chaotic," which he blamed Nina for causing. The judge was also concerned with Nina's treatment of Haley with relation to medication as she attempted "to get repeat doses of medication for [Haley], even before it was time," and requested that Haley be treated with various other drugs that the doctors advised against. The judge also noted his concern with the children's excessive absences at school, especially when Haley's attendance at camp was excellent.

Judge Flynn found Dr. Cahill to have been a credible expert witness. He also addressed the testimony of Nina's expert, Dr. Brown, the mental health professional who had testified at an earlier hearing, but not at trial. The judge concluded his "background was totally inappropriate to the issue at hand [and h]e had no expertise in this area [so] his opinion was not of value."

The judge also found that once the children were removed, the children's eating habits were back to normal. In the care of Kyle, the children were minimally missing school and were doing well in school, they were involved in extracurricular activities, they had friends, went on vacations, and they were healthy again. Judge

Flynn concluded that "the children [were] safe, and they . . . no longer need the services of the Division under these circumstances."

The judge then conducted a best interests analysis, applying the factors set forth in N.J.S.A. 9:2-4 in order to determine whether the children should remain in Kyle's custody. He concluded that although there was no psychological evaluation of Nina, which would have been helpful, he was satisfied that Nina had FDIA, and "that it would be highly improper for [him] to award custody of the children to" Nina. The judge awarded continued sole legal and physical custody to Kyle, with Nina having visitation rights. Kyle was held responsible for all decisions relating to the children's health and education, and he was not to consult Nina on these issues. The judge directed Kyle "to immediately file an application under the FD docket" for sole custody, which the judge would thereafter grant, just so Kyle had the order going forward in a Pennsylvania court. This appeal followed.

## II.

## A.

Our review of a Family Part judge's determination in custody and parenting-time matters is limited. We "accord deference to family [judges'] factfinding[s]," "because of the family [judge]s' special jurisdiction and expertise in family matters." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting

Cesare v. Cesare, 154 N.J. 394, 413 (1998)).  Indeed, a Family Part judge must "frequently . . . make difficult and sensitive decisions regarding the safety and well-being of children."  Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007).  We have "invest[ed] the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children."  N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 365 (2017) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012)).  Where a Family Part judge relies on evidence adduced at a hearing, we also "defer to the factual findings . . . because [the judge] has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; [the judge] has a 'feel of the case' that can never be realized by a review of the cold record."  N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

We accord substantial deference to the factual findings of the Family Part when they are supported by "adequate, substantial, and credible evidence" in the record.  N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014).  We "defer to [F]amily [P]art judges 'unless they are so wide of the mark that our intervention is required to avert an injustice.'"  Ibid. (quoting F.M., 211 N.J. at 427).

However, we "owe no special deference to the trial judge's legal determinations." Slawinski v. Nicholas, 448 N.J. Super. 25, 32 (App. Div. 2016). "Notwithstanding our general deference to Family Part decisions, [we are] compelled to reverse when the [trial judge] does not apply the governing legal standards." Ibid. (citation omitted).

B.

With these guiding principles in mind, we turn to Nina's and the Law Guardian's contentions on appeal. Nina argues that Dr. Cahill was not qualified and made inappropriate findings, which were "irreparably flawed and unreliable," and therefore, the judge's March 2019 order should be vacated. Specifically, she found it inappropriate for Dr. Cahill to have relied exclusively on Dr. Medina's summary of Haley's medical records, even though Dr. Medina did not review the full medical record and her findings contained errors. Also, Nina contends Dr. Cahill ignored evidence that supported Nina's fitness as a parent and Dr. Cahill did not have the relevant expertise. Nina also claims Dr. Cahill did not understand the severity of Haley's health, and she argues that Dr. Cahill was not qualified as an expert and labeled her opinion as a net opinion.

Nina further argues that it was also improper and a significant mistake for Dr. Cahill to have claimed that Nina requested Haley be placed on a feeding tube, or for

the doctor to have stated Nina was the only one who witnessed Haley vomit and she was not dehydrated, when the medical records stated otherwise. She further argued that it was inappropriate for Dr. Cahill not to have interviewed her fact witnesses, and not to evaluate her with the children.

The Law Guardian's appellate contentions focus on Haley's health improving in 2015 prior to the separation test and argues for that reason the judge's reliance on the outcome of the separation test was misplaced.

We have considered Nina's and the Law Guardian's contentions in light of the record and the applicable principles of law. We find them to be without merit.

In a Title Thirty action for care and supervision, the Division is authorized to intervene when "a child who, although not abused or neglected, [may be] in need of services to ensure [his or her] health and safety." N.J. Div. of Youth & Family Servs. v. T.S., 426 N.J. Super. 54, 64 (App. Div. 2012). The Division may seek a "court order to intervene and require a [parent or guardian] to undergo treatment, or seek other relief, if the best interests of the child so require." N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 9 (2013).

Once a judge determines the Division's supervision or care is no longer needed, the judge should dismiss the matter, T.S., 426 N.J. Super. at 66, and conduct a dispositional hearing "to determine whether a child who has been in the care,

supervision, and custody of the Division 'may be safely returned to the custody of the parent from whom the child was removed.'" <u>N.J. Div. of Youth & Family Servs. v. I.S.</u>, 422 N.J. Super. 52, 70 (App. Div. 2011) (quoting <u>N.J. Div. of Youth & Family Servs. v. N.D.</u>, 417 N.J. Super. 96, 107 (App. Div. 2010)), <u>opinion clarified on denial of reconsideration</u>, 423 N.J. Super. 124 (App. Div. 2011), <u>aff'd in part, rev'd in part,</u> <u>N.J. Div. of Youth & Family Servs. v. I.S.</u>, 214 N.J. 8 (2013).

"When a court determines that a child may not be safely returned to the parent from whom the child has been removed, the court may proceed with a guardianship action and termination of parental rights." <u>I.S.</u>, 422 N.J. Super. at 70 (citing <u>N.J. Div. of Youth & Family Servs. v. R.D.</u>, 207 N.J. 88, 121–22 (2011)). "An exception to initiating such an action exists when 'the child's needs for stability and attachment' are met by the non-custodial parent or other relative." <u>Ibid.</u> (quoting <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 609 (1986)).

The standard for the dispositional hearing is the best interests of the child under N.J.S.A. 9:2-4, unless the Title Thirty action involves an out-of-home placement of the child and a dispute that does not involve two parents. <u>See</u> <u>I.S.</u>, 214 N.J. at 40. The statute "is commonly used in a variety of family matters before a court when making an initial custody determination or a change in custody is requested." <u>Ibid.</u> As a result, a parent seeking the return of his or her child bears the

31

burden to prove a change in circumstances warranting the child's return to that parent's custody. Id. at 39–41.

"[A] noncustodial parent who obtains full-time care of a child after the initiation of child-protection proceedings 'may always initiate a request for a change in custody,' which involves a changed-circumstances inquiry and, ultimately, becomes a best-interests analysis." I.S., 214 N.J. at 40 (quoting N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 402 n.3 (2009)). The parent to whom custody was temporarily transferred during the child-protection litigation has the burden of proving placement with them under the best-interests standard. See id. at 40–41. Even if this process is not followed "precisely," placement with the parent to whom custody was temporarily assigned is suitable when that parent is "the only appropriate parent to award custody . . . at the dispositional conclusion of [the] . . . Title [Thirty] proceeding." Id. at 41.

A parent who receives custody temporarily can seek permanent custody based upon the other spouse's psychological incapacity, because "a psychiatric disability can render a parent incapable of caring for his or her children." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 94 (App. Div. 2008). This is so even if parents are otherwise "morally blameless . . . ." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438, 458 (App. Div. 2001).

Typically, although not required, best interests determinations, especially those involving mental or physical health issues, are made with the help of experts, who a trial judge finds to be credible. See Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002); Wist v. Wist, 101 N.J. 509, 514 (1986). To be admissible, an expert's opinion must meet the requirements of N.J.R.E. 703.

N.J.R.E. 703 mandates that expert opinion be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). The opinion "requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion." State v. Townsend, 186 N.J. 473, 494 (2006).

Here, while it is true Dr. Cahill failed to consider all of Haley's medical records and did not actually observe Nina with the children, her unrefuted opinion was well supported by facts in the trial record. First, Dr. Cahill had extensive experience with FDIA and was an expert in evaluating whether a parent suffered with that disorder. Second, in reaching her opinion, the doctor relied on her own evaluation of the parties and their children, volumes of medical records as

summarized by Dr. Medina, and significantly, the results of the children's separation from Nina.

To the extent that Nina argues Dr. Cahill's evaluation was deficient because there was no evaluation of Nina with the children, her contention ignores the fact that portion of the evaluation was not conducted due to Nina's conduct. Moreover, like her other arguments about deficiencies in Dr. Cahill's testimony, her contentions are unsupported by any expert opinion to the contrary. Each of the judge's findings here were well supported by Dr. Cahill's unrefuted expert testimony and the other evidence adduced at the trial. We have no cause to disturb the outcome here.

We are not persuaded otherwise by the Law Guardian's contentions either. While judges normally would consider the wishes of the children, Judge Flynn correctly concluded because

> the fact that the children's ideas and impressions about who they are and how they're feeling, and what kind of illnesses they have or don't have, have been so infected by what the mother has done, . . . their particular decisions cannot be given the kind of weight that the Court otherwise would normally give it.

As the extensive record demonstrates and Dr. Cahill sufficiently explained, Nina's FDIA diagnosis caused Haley to have a distorted view of reality, which negatively impacted her relationship with Kyle. The fact that Haley started to feel better prior to Kyle getting sole legal and physical custody is insufficient to support

34

the return of custody to Nina. Here, Haley had been treated for her stomach issues since September 2013. It is not a coincidence that Haley's life started to get back to normal after the Division's involvement and when she was taken off medications.

Even if Haley's and Carrie's health started to get better in Nina's care, there is clear evidence that Nina suffers from FDIA that greatly impacted the children's lives, and that the Division's and Kyle's assistance helped get their lives back to normal. Moreover, once Haley and her sisters were removed from Nina's care and placed with Kyle, they began to thrive in most aspects of their life. Haley was attending and doing good in school, excelling in her musical endeavors, she had a good group of friends, she ate well, was no longer on medication, and most importantly was no longer suffering from abdominal pain. Further, neither Carrie nor Sarah demonstrated any concern with Kyle's care and supervision.

Finally, contrary to Nina's contention, in making his decision, the judge did not rely on whether Nina requested Haley be placed on a feeding tube. The judge clearly stated in his findings that "[i]t's clear that it was not the mother who recommended or pushed for feeding tubes." Instead, when considering the best interests of the children, the judge relied upon the extensive medical records and the testimony of Kyle, Dr. Cahill, the Division workers, the former school principal, and others.

A-3702-18T1

To the extent we have not specifically addressed any of Nina's or the Law Guardian's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3702-18T1